Karolina Klyuchnikova (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
kklyuchnikova@scott-scott.com

*Counsel for Plaintiff James Alvrus
and the Proposed Class*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ALVRUS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> XPLR INFRASTRUCTURE, LP f/k/a NEXTERA ENERGY PARTNERS, LP, JOHN W. KETCHUM, BRIAN W. BOLSTER, TERRELL KIRK CREWS II, and NEXTERA ENERGY, INC., <br><br> Defendants. | Case No. 3:25-cv-01755-JLS-DDL <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff James Alvrus ("Plaintiff"), individually and on behalf of all others similarly situated (together, the "Class"), by his undersigned attorneys, alleges the following against XPLR Infrastructure, LP f/k/a NextEra Energy Partners, LP ("XPLR"), John W. Ketchum, Brian W. Bolster, Terrell Kirk Crews II, and NextEra Energy, Inc. (together, the "Defendants") based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, Defendants' filings with the U.S. Securities and Exchange Commission ("SEC"), press releases and news articles regarding Defendant XPLR, and analysts' reports and advisories about XPLR and the industry within which it operates. Plaintiff's investigation is ongoing and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. Plaintiff brings this action (the "Action") for violations of the federal securities laws on behalf of the Class consisting of all persons and entities, other than Defendants, that purchased or otherwise acquired XPLR common units between May 8, 2023 and January 27, 2025, inclusive (the "Class Period").

2. This Action seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against XPLR, its controlling company, and certain of its executives.[1] Defendants made material misrepresentations and omissions concerning XPLR's business, operations, and

---

[1] 15 U.S.C. §§78j(b), 78t(a); 17 C.F.R. §240.10b-5.

1

FIRST AMENDED CLASS ACTION COMPLAINT

management, which artificially inflated the price of XPLR common units during the Class Period.

## **INTRODUCTION**

3.  XPLR is a "yieldco" which acquires, owns, and manages contracted clean energy projects in the United States, including a portfolio of wind, solar, and battery storage projects.  Because XPLR is structured as a limited partnership, its investors hold "units" rather than shares of stock, and are referred to as "unitholders" rather than shareholders.

4.  XPLR changed its name from "NextEra Energy Partners, LP" to "XPLR Infrastructure, LP" in January 2025.  For convenience and clarity, it is referred to as "XPLR" throughout this Complaint regardless of the time period.

5.  A yieldco is a publicly traded company formed separately from its parent to own and hold operating assets that produce predictable cash flow. Investors buy yieldco units for distributions, and receive limited voting rights alongside their units.

6.  At all relevant times, Defendant NextEra Energy, Inc. ("NEE"), the parent company, was affiliated with and controlled XPLR, and provided XPLR with potential and actual energy projects.

7.  NEE is in the business of creating wind, solar, and battery storage projects.  It sold some of these projects to XPLR.  XPLR's controlled subsidiary, XPLR Infrastructure Operating Partners, LP ("OpCo"), operated the projects.

8.  During the Class Period, Defendants misrepresented XPLR's financial condition, including its ability to pay distributions to investors and maintain its yieldco model, in order to obtain favorable financing for NEE in 2024.

9.  Throughout the Class Period, NEE provided XPLR with executives, officers, and directors—all of whom also held positions at NEE – and disclosed that they could choose to put NEE's interests above those of XPLR.

FIRST AMENDED CLASS ACTION COMPLAINT

10. XPLR, therefore, was controlled by NEE.

11. NEE formed XPLR in June 2014 as a yieldco. XPLR was designed to hold operational renewable energy projects developed by NEE.

12. NEE provided, which is also referred to as "dropped down," operational projects to XPLR in exchange for payment.

13. XPLR obtained funds to pay NEE for projects through debt, equity issuances, and other financial arrangements.

14. XPLR, in turn, generated cash from these already operational projects.

15. Yieldcos, including XPLR, pay out most of their cash flow as distributions rather than retaining earnings, and investors buy units in yieldcos primarily to receive those distributions.

16. Because yieldcos, including XPLR, distribute most of their cash, they often cannot fund acquisitions internally and depend highly on debt and equity issuances to finance growth.

17. By structuring XPLR as a yieldco, NEE provided itself with numerous financial benefits.

18. Via XPLR, NEE created a built-in buyer for completed projects. This allowed NEE to recycle capital into new development, meaning that NEE sold projects to XPLR in return for cash proceeds that it could then redeploy to other projects.

19. Further, NEE was a unitholder in XPLR, meaning that it itself benefited from unitholder distributions.

20. NEE also benefited from XPLR due to various tax incentives and due to fees collected from XPLR under a Management Services Agreement ("MSA")— including management fees and incentive distribution rights fees ("IDR fees") paid by XPLR's subsidiary OpCo.

3

FIRST AMENDED CLASS ACTION COMPLAINT

21. The amount of IDR fees collected by NEE was based on the achievement of certain target quarterly distribution levels to OpCo's unitholders, meaning that higher distributions to unitholders resulted in higher IDR fees, up to a maximum.

22. XPLR—through OpCo (formerly known as NEP OpCo)—pays NEE an annual management fee for providing operational services, such as managing XPLR's day-to-day affairs.

23. Further, NEE, through a subsidiary, could borrow funds from XPLR's subsidiaries and return them only as needed, providing NEE with additional capital.

24. Throughout the Class Period, XPLR continuously promised distribution growth: "[our] primary business objective is to deliver cash distributions to common unitholders which [we plan] to grow over time."  XPLR committed to this strategy and said it would "[g]row [its] business and deliver cash distributions through selective acquisitions of ownership interests in operating projects or projects under construction."

25. From its inception in 2014 until XPLR suspended distributions in January 2025, XPLR's growth rate of unitholder cash distributions was on average 24.3% per year.  In the five years prior to the suspension of distributions, the growth rate was on average 13.2% per year.

26. To sustain both continuous acquisitions and distribution growth, XPLR required ongoing refinancing and access to cheap capital.

27. In promising both distribution growth and continuous acquisitions, XPLR committed to two competing uses of cash.  While each dropped down project brings in new cash flow, however, that income has to help cover the debt used to buy the projects, for operational expenses, and to still contribute to distribution growth.

4

FIRST AMENDED CLASS ACTION COMPLAINT

28.     In addition to funding acquisitions through debt and equity issuances, XPLR was able to hew to its yieldco model by entering into various convertible equity portfolio financing agreements ("CEPFs").

29.     CEPFs are created through a partnership structure backed by specific underlying energy assets.  Investors purchase CEPF interests with cash and receive a minority portion of the cash distributions from the underlying assets for a specified time period, generally three to ten years.  After that time, XPLR can buyout the CEPF investor for cash or XPLR equity at a fixed return.  If XPLR elects not to do so, the underlying asset—and its cash distributions—are transferred to the CEPF investor.

30.     XPLR used cash raised through CEPF transactions, in part, to fund acquisitions of energy projects.

31.     From 2018 through 2023, XPLR raised approximately $5.7 billion through CEPF transactions.

32.     However, the buyouts of these CEPFs required about $5 billion of liquidity between about 2025 and 2034.

33.     Due to the high payout ratio built into its yieldco structure, XPLR lacked the liquidity required for these buyouts.  Rising interest rates made acquiring additional debt for CEPF buyouts and other uses uneconomical, and issuing additional equity would have caused significant unitholder dilution (meaning that each unitholder would have a smaller ownership percentage in XPLR and lower distributions).

34.     By at least May 2023, Defendants knew that they could not sustain unitholder distributions while at the same time completing the CEPF buyouts that required about $5 billion.

5

FIRST AMENDED CLASS ACTION COMPLAINT

35. Moreover, XPLR had about $3.4 billion ($1.6 billion at 0.78% and $1.8 billion at 4.22%) in debt that was to mature through 2027, which would require taking out additional debt amid elevated interest rates.

36. XPLR needed liquidity to buy out the CEPFs without diluting unitholders or taking on large debt at high interest rates.

37. At the end of 2022, XPLR had only about $226 million of cash on hand; in 2023, it had about $274 million; and in 2024, it had about $283 million.

38. XPLR's total current assets (including cash on hand) were about $1.86 billion in 2022, about $2.2 billion in 2023, and about $860 million in 2024.

39. In 2022, among other payments, XPLR paid about $1.050 billion in operating expenses and over $1.5 billion in debt payments. It had only about $634 million in cash available for distribution ("CAFD").

40. In 2023, among other payments, XPLR paid about $1.106 billion in operating expenses and over $1.5 billion in debt payments, totaling over $2 billion. It had only about $689 million left over in CAFD.

41. In 2024, among other things, XPLR paid about $1.702 billion in operating expenses and about $1.3 billion in debt payments, totaling $1.8 billion. It then utilized the CSCS funds, in part, for investor distributions.

42. XPLR's operating income decreased and became negative in 2023 and dropped even further in 2024—at -$28 million and -$459 million, respectively—eliminating further the possibility of funds for CEPF buyouts.

43. XPLR's net income also drastically decreased from 2022 to 2024, going from $1.121 billion, to $218 million, and dropping to -$411 million, respectively, eliminating further the possibility of funds for CEPF buyouts.

44. XPLR simply did not have the cash, with only $375 million in cash available after distributions in 2023, and $296 million in 2024.

FIRST AMENDED CLASS ACTION COMPLAINT

45. NEE, which controlled XPLR and was financially benefiting from it, could not reveal that XPLR would have to terminate distributions, because NEE was seeking to obtain financing for its projects and development from large financial institutions.

46. Since at least 2023, NEE had been seeking to expand its projects and developments.

47. Admitting that XPLR was failing to sustain its yieldco model meant admitting that NEE would no longer have the same financial benefits from XPLR that it had before—and would signal to financial institutions that NEE was less financially solvent. NEE, therefore, would put itself at risk of getting less favorable terms from such financial institutions, or no financing at all.

48. NEE relied on XPLR to recycle capital for tax incentives, for various fees (including management and IDR fees), and for capital. Moreover, as of June 2024, NEE would owe $20 billion in capital expenditures if XPLR were to fail. Disclosing XPLR's financial difficulties would signal instability to financial institutions and create obstacles for NEE's financing efforts.

49. NEE, therefore, had strong incentives to conceal XPLR's financial troubles.

50. To maintain the illusion that XPLR remained healthy, on May 8, 2023, NEE suspended the IDR fees that XPLR OpCo paid to it for all quarters from 2023 through 2026, increasing cash available for XPLR's unitholder distributions. XPLR's announcement also stated that XPLR "continues to expect to grow limited partner distributions per unit by 12% to 15% through at least 2026." This statement was false and misleading. In reality, this announcement marked the beginning of XPLR actively abandoning its yieldco business model, and thus the start of the Class Period.

7

FIRST AMENDED CLASS ACTION COMPLAINT

51.    By suspending IDR fees and promising continued distributions through 2026, NEE maintained the illusion that the yieldco model was still working and gave investors false hope that distributions would continue.  In reality, Defendants knew that distributions would not continue, and used the IDR suspension as a stopgap for the truth.

52.    Furthermore, in mid-2023, NEE stopped dropping down projects to XPLR, meaning that XPLR had less cash generating potential from projects—indicating that NEE knew that XPLR's model could not be sustained.

53.    NEE trickled out the truth by announcing a cut in distribution growth. On September 27, 2023, just over four months after reaffirming its distribution growth guidance in May 2023, XPLR revised distribution per unit "growth expectations to 5% to 8% per year through at least 2026, with a target of 6% growth." Again, Defendants knew that they could not sustain any distributions, and yet continued to mislead investors into believing that the yieldco model would continue.

54.    Further, XPLR blamed high interest rates on the distribution growth expectations cut, even though interest rates grew a mere 0.25 points between May 2023 and September 2023.  XPLR gave no indication that abandoning the yieldco model or distributions entirely was under consideration.  That same day, XPLR further assured investors that it "does not expect to require growth equity to meet its revised growth expectations until 2027."

55.    On the news disclosed on September 27, 2023, the price of XPLR's common units fell from a closing price of $46.90 per unit on September 26, 2023 to a closing price of $37.46 per unit on September 27, 2023—a decline of $9.44 per unit, or approximately 20%.

56.    Throughout the Class Period, and until the truth fully came out on January 28, 2025, Defendants continued to make statements assuring investors that distribution growth expectations remained at 5-8% through at least 2026.

8

FIRST AMENDED CLASS ACTION COMPLAINT

57. While Defendants kept misleading investors about XPLR's financial status, NEE closed three financial transactions in 2024 – totaling about $4.4 billion in liquidity.

58. Throughout the Class Period, Defendants continued to assure investors that unitholder distributions would continue, despite knowing this was not true. Defendants knew that XPLR's financial position could not support continued distributions and also meet its CEPF buyout obligations. Even as they publicly assured investors otherwise, Defendants were taking steps to prepare for the suspension of distributions while keeping up the illusion that XPLR would continue with its model and distributions. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPLR could not sustain its yieldco business model; (ii) Defendants had entered into financing arrangements that could not be resolved without suspension of distributions; and (iii) Defendants had determined, no later than May 2023, that cash distributions to investors would be eliminated.

59. The full extent of Defendants' fraud was revealed on January 28, 2025—a mere three months after NEE closed its $4.4 billion in financial transactions—when XPLR announced that it would suspend all cash distributions to common unitholders, replace its executive team, and abandon its yieldco model.

60. On this news, the price of XPLR's common units fell from a closing price of $15.80 per unit on January 27, 2025 to a closing price of $10.49 per unit on January 29, 2025—a decline of $5.31 per unit, or nearly 35%.

61. In sum, Defendants perpetuated a plot to conceal XPLR's inevitable failure as a yieldco while NEE extracted maximum value from the arrangement by keeping up the illusion of XPLR's continued success—to secure financing for itself. By May 2023, Defendants knew that XPLR's competing obligations (about $5 billion in looming CEPF buyouts and its commitment to continued distribution

9

FIRST AMENDED CLASS ACTION COMPLAINT

growth) were irreconcilable without access to cheap capital that rising interest rates had foreclosed.  Rather than disclose this reality, Defendants chose concealment: NEE suspended its own IDR fees to make it seem as though they were creating financial flexibility for XPLR, ceased dropping down projects to XPLR, and continued to publicly reaffirm distribution growth guidance they knew to be false.  These actions were not responses to changing market conditions, but rather deliberate measures to buy time while NEE secured $4.4 billion in financing before XPLR's January 2025 announcement.  Only when NEE obtained this capital did Defendants reveal what they had long known: XPLR's yieldco model had failed, distributions would be eliminated, and unitholders' investments had been decimated.

62.    Through this Action, Plaintiff, on behalf of himself and the Class he seeks to represent, seeks to recover damages for the losses he has suffered as a result of Defendants' wrongful acts and omissions.

## JURISDICTION AND VENUE

63.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.[2]

64.    This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

65.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b)(2).  Plaintiff is a resident in this District, reviewed Defendants' misrepresentations, and made his investment decisions based thereon in this District.

66.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and wire communications, and facilities of the national securities markets.

---

[2]    15 U.S.C. §§78j(b), 78t(a); 17 C.F.R. §240.10b-5.

10

FIRST AMENDED CLASS ACTION COMPLAINT

## **PARTIES**

67.    Plaintiff James Alvrus, a resident of Oceanside, San Diego, California, as set forth in his certification previously filed with this Court, acquired XPLR units at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

68.    Defendant XPLR is a Delaware limited partnership with principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida, 33408. XPLR's units trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "XIFR."  Before January 2025, XPLR was known as NextEra Energy Partners, LP and traded on the NYSE under the ticker symbol "NEP."

69.    Defendant NEE is a Florida corporation with principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida, 33408.  At all relevant times, NEE was affiliated with and controlled XPLR.  In addition, at all relevant times, XPLR and "an indirect wholly owned subsidiary of" NEE (NextEra Energy Management Partners, LP) were parties to the MSA, "under which operational, management and administrative services are provided to XPLR under the direction of the board, including managing XPLR's day-to-day affairs and providing individuals to act as XPLR's executive officers."[3]

70.    Defendant John W. Ketchum was an executive officer at XPLR, serving as its Chief Executive Officer ("CEO") from March 1, 2022 to January 27, 2025. He has also served as Chair of XPLR's Board of Directors since July 29, 2022.  Since March 2022, he also served as the President, CEO, and director of NEE, and as chairman since July 2022.  He has also served as chairman of NEE's subsidiary, Florida Power & Light Company ("FPL"), since February 2023.

---

[3]    XPLR Infrastructure, LP, Form 10-K (Dec. 31, 2024).

11

FIRST AMENDED CLASS ACTION COMPLAINT

71.    Defendant Brian W. Bolster was an executive officer at XPLR, serving as its Chief Financial Officer ("CFO") from May 6, 2024 to January 27, 2025.  He has also served as a director on XPLR's board since May 2024.  Since May 2025, he also serves as President and CEO of NextEra Energy Resources, LLC ("NEER," NEE's wholly owned subsidiary), and from May 2024 to May 2025 served as the Executive Vice President, Finance and CFO for NEE, and the Executive Vice President, Finance and CFO of FPL.

72.    Defendant Terrell Kirk Crews II was an executive officer at XPLR, serving as its CFO from March 1, 2022 to May 6, 2024.  He was also on XPLR's board of directors from April 2022 to May 2024.  From March 2022 to May 2024, he also served as an Executive Vice President, Finance and CFO of NEE and as Executive Vice President, Finance and CFO of FPL.  He continues to have an executive officer role at NEE as a Chief Risk Officer and Executive Vice President.

73.    Defendants Ketchum, Bolster, and Crews are sometimes referred to herein as the "Individual Defendants."

74.    The Individual Defendants possessed the power and authority to control the contents of XPLR's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of XPLR's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with XPLR, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

12

FIRST AMENDED CLASS ACTION COMPLAINT

## STATEMENT OF FACTS

### I.    XPLR and the Yieldco Model

75.    In a June 2014 press release, NEE announced that it formed XPLR as a "growth oriented limited partnership" that would own "fully contracted" renewable energy projects "with stable, long-term cash flows."  Throughout the Class Period, XPLR owned and managed a portfolio of wind, solar, and battery storage projects in the United States, and functioned as a yieldco.

76.    A yieldco is a publicly traded company formed separately from its parent to own and hold operating assets that produce predictable cash flow. Investors buy yieldco units for distributions, and receive limited voting rights alongside their units.  Here, as the parent company, NEE originated projects and then facilitated the "drop-down" of completed projects to the yieldco, XPLR.  NEE took on the risk of underwriting and developing the projects.  XPLR received stable cash flows from long-term power purchase agreements ("PPAs"), which funded distribution payouts to unitholders.  This structure freed up capital for NEE to develop new projects while offering investors a lower risk distribution vehicle: XPLR.

77.    NEE controlled XPLR through the MSA and benefited from XPLR in myriad ways.

78.    NEE utilized XPLR for capital recycling, meaning that it sold projects to XPLR in return for cash proceeds that it could then redeploy to other projects.

79.    NEE received numerous fees from XPLR, including management fees and IDR fees.  The IDR fee was based on the achievement of certain target quarterly distribution levels.

80.    NEE received millions of dollars in distributions annually from owning units of XPLR.

13

FIRST AMENDED CLASS ACTION COMPLAINT

81.    NEE benefited from various tax incentives via XPLR.  As stated in NEE's February 2023 investor presentation, XPLR was not expected to pay "meaningful U.S. taxes for at least 15 years."

82.    Importantly, because XPLR is a limited partnership, it does not itself pay corporate income tax on its profits (unlike NEE).  Instead, XPLR's income "passes through" to NEE as it owns a large share of XPLR units.  NEE then reports its share of income on its tax return, avoiding having to pay corporate-level taxes.  This structure prevents NEE from being double taxed—once at the corporate level and again at the individual level when profits are distributed to shareholders as distributions.

83.    Further, when XPLR reported negative tax expenses, for example, through depreciation and bonus tax deductions on renewable assets (as it did in 2020, 2023, and 2024), NEE could claim its portion of the tax deductions on its own tax returns, reducing its cash tax liability.

84.    XPLR depended highly on debt and equity issuances to finance new acquisitions.  This is because yieldcos pay out most of their cash flow as distributions rather than retaining earnings, so they often cannot fund acquisitions internally.

85.    Debt is more expensive when interest rates are high.  Thus, XPLR is constructed to thrive in a low-rate environment.  Meanwhile, throughout the Class Period, interest rates remained elevated, ranging from 4.33% to 5.50%.

86.    Book value is a company's total assets minus liabilities, representing the company's net worth.  Negative book value means a company has more liabilities than assets.  Positive book value means a company has more assets than liabilities.

87.    Equity issuance is inherently dilutive, but the impact depends on unit price.  If the units trade above book value (that is, units are trading above the company's net assets), issuing new units brings in more capital per-unit than the value of existing assets, allowing growth without diluting existing unitholders.

14

FIRST AMENDED CLASS ACTION COMPLAINT

88.     If the unit price falls below book value (that is, units are trading below the company's net assets), further issuance dilutes unitholders faster than it adds value, making the yieldco unable to buy assets from the parent company without massive dilution.  Thus, the viability of the yieldco model is highly dependent on unit price.

89.     From September 2023 to December 31, 2024, XPLR's unit price was below book value, indicating that further equity issuance would dilute unitholders, as follows:

| Filing Date | BVPS ($) | Market Close ($) | P/B | % Above/Below Book |
|---|---|---|---|---|
| Jun 30, 2023 | 38.2 | 58.64 | 1.54× | +54% |
| Sep 30, 2023 | 37.9 | 29.70 | 0.78× | -22% |
| Dec 31, 2023 | 38.3 | 30.41 | 0.79× | -21% |
| Mar 31, 2024 | 38.1 | 30.08 | 0.79× | -21% |
| Jun 30, 2024 | 37.9 | 27.64 | 0.73× | -27% |
| Sep 30, 2024 | 36.56 | 27.62 | 0.76× | -24.5% |
| Dec 31, 2024 | 34.45 | 17.59 | 0.51× | -49% |

90.     In addition to funding acquisitions through debt and equity issuances, XPLR was able to hew to its yieldco model by entering into various CEPFs.

91.     XPLR began using CEPFs in 2018 and claimed that they "combine[d] the best attributes of other well-known convertible products."[4]

92.     CEPFs are created through a partnership structure backed by specific underlying energy assets.  Investors purchase CEPF interests with cash and receive a minority portion of the cash distributions from the underlying assets for a specified time period, generally three to 10 years.  After that time, XPLR can buyout the CEPF

---

[4]     NextEra Energy Partners, *Convertible Equity Portfolio Financings*, at 13 (2020),     https://www.investor.nexteraenergypartners.com/~/media/Files/N/NEP-IR/news-and-events/events-and-presentations/2020/12-23-2020/NEP%20CEPF%20Teach%20In%2012-23-2020.pdf [https://perma.cc/CA9E-6SQQ].

FIRST AMENDED CLASS ACTION COMPLAINT

investor for cash or XPLR equity at a fixed return. If XPLR elects not to do so, the underlying asset—and its cash distributions—are transferred to the CEPF investor.

93. XPLR used the cash raised through CEPF transactions, in part, to fund acquisitions of energy projects.

94. From 2018 through 2023, XPLR raised about $5.7 billion in financing through CEPF transactions.

95. Billions of dollars in CEPFs buyouts, however, had to be addressed between 2025 and 2034, at which point XPLR required liquidity to fulfill its plan of buying them out.

96. Yieldcos rely primarily on acquisitions for expansion. As of December 31, 2023, XPLR consisted of renewable energy assets acquired between 2014 and 2023, totaling 10,118 net MW. The PPAs governing these assets began expiring as early as 2025.

97. As of December 31, 2024, XPLR's portfolio remained at 10,118 net MW, reflecting no growth in capacity year-over-year. This indicates that XPLR did not add any projects to its portfolio in 2024 and was no longer expanding in the manner traditionally explored by yieldcos.

**II.    XPLR's Relationship with NEE**

98. At all relevant times, NEE controlled XPLR and benefited from XPLR in numerous ways.

99. At all relevant times, while being executive officers of XPLR, the Individual Defendants were also executives, officers, and/or directors of NEE and/or its affiliates.

100. At all relevant times, XPLR did not have any employees and relied solely on employees provided under the MSA, including employees of NEE and NEER, to serve as officers of XPLR.

16

FIRST AMENDED CLASS ACTION COMPLAINT

101. At all relevant times, XPLR executive officers were compensated by NEE or its affiliates.

102. At all relevant times, therefore, all XPLR decisions were made and carried out by NEE's executives, officers, and/or directors.

103. At all relevant times, NEE stated that officers of XPLR who are also officers of NEE may favor NEE's interests over those of XPLR and its unitholders.

104. In its 2014 annual report, NEE stated that XPLR was "structured [] to ensure a close alignment of interests between Next Era Energy shareholders and [XPLR] unitholders. All [XPLR] projects continue to be operated by the Energy Resources team, and [XPLR's] value in part reflects its ability to acquire projects developed at Energy Resources."

105. In its 2014 annual report, NEE further stated that XPLR "helps us execute our strategy of recycling capital from operating assets," that NEE "receives cash through incentive distribution right fees," and that "the success of [XPLR] highlights the value investors place on contracted clean energy projects and, therefore, the value of wind and solar projects that remain in the Energy Resources portfolio and its development pipeline."

106. Under the MSA, as outlined in each of XPLR's quarterly and annual filings, an "indirect wholly owned subsidiary of NEE provides operational, management, and administrative services" to XPLR. This includes "managing [XPLR's] day-to-day affairs and providing individuals to act as [XPLR's] executive officers and directors." This subsidiary is NEER.

107. NEER is completely owned and controlled by NEE, and NEE consolidates NEER's financial statements with its own.

108. Through NEER, NEE provided XPLR and its operating subsidiary, OpCo, with access to actual or potential projects for purchase.

109. Projects were dropped down from NEER to OpCo.

17

FIRST AMENDED CLASS ACTION COMPLAINT

110. At all relevant times, XPLR owned a controlling, non-economic general partner interest and an approximately 48.6% limited partner interest in OpCo, and fully consolidated OpCo in its financial statements. XPLR, therefore, controlled OpCo.

111. At all relevant times, NEE held an approximately 51% noncontrolling limited partner interest in OpCo.

112. The OpCo structure separated asset ownership from the publicly traded entity, with cash flowing up from OpCo to XPLR to fund unitholder distributions.

113. Through OpCo, XPLR owned a portfolio of contracted renewable energy assets.

114. OpCo held and operated such projects.

115. NEER dropped down projects to OpCo every year until 2023 (excluding 2017), with the final drop down closing in 2Q 2023.

116. NEER has not dropped down any projects to OpCo since 2Q 2023, indicating that Defendants did not believe that XPLR could financially sustain capital to purchase a dropped down project.

117. At all relevant times, XPLR generated its cash flow, in part, through distributions it received from OpCo, which in turn received its cash distributions from its subsidiaries.

118. XPLR, in turn, provided distributions to its investors, including NEE which has maintained a majority ownership stake in XPLR.

119. Under the MSA, IDR fee payments were to be made by OpCo to an NEE affiliate "based on the achievement by [XPLR] OpCo of certain target quarterly distribution levels to its unitholders."

120. The IDR fee paid to NEE was based on target quarterly distribution levels to OpCo's common unitholders.

18

FIRST AMENDED CLASS ACTION COMPLAINT

121.   Payment of the IDR fee reduced the amount of cash distributions to unitholders.

122.   During 2022, 2021, and 2020, OpCo paid approximately $152 million, $129 million, and $104 million in IDR fees to NEE, respectively.  IDR fees were suspended in 2023.

123.   Further, "NEER operates essentially all of the energy projects owned by [XPLR] and provides services to [XPLR] under various related party operations and maintenance, administrative and management services agreements (service agreements)."

124.   Under the Cash Sweep and Credit Support Agreement ("CSCS"), NEER could borrow funds from XPLR's subsidiaries and return them only "as needed."

125.   In addition, XPLR paid an annual fee to NEER under the CSCS for NEER providing credit support (such as guarantees and project obligations for lenders) on behalf of XPLR to reduce risk for lenders and counterparties.

126.   Fee income to NEE related to the CSCS agreement and the service agreements totaled approximately $59 million, $174 million and $148 million for the years ending in December 31, 2023, 2022 and 2021, respectively.

**III.    By 2023, XPLR's Yieldco Model Was Unraveling**

127.   By 2023, XPLR's model was failing due to increasing interest rates, decreasing unit price, and an inability to fund CEPF obligations while making distributions.

128.   In 2023, XPLR's unit price was decreasing and interest rates were increasing, creating pressure on XPLR's financing model, including the use of CEPFs.

129.   In its 10-K for 2022, filed on February 23, 2023, XPLR wrote: "[XPLR's] ongoing operations use cash to fund O&M expenses . . . , maintenance

19

capital expenditures, debt service payments and related derivative obligations . . . , distributions to common unitholders, and distributions to the holders of noncontrolling interests *and the payment of any cash portion of the purchase price payable in connection with the exercise of a buyout right . . . [XPLR] expects to satisfy these requirements primarily with internally generated cash flow*" (emphasis added).

130. In its 10-Q for 1Q2023, filed on April 25, 2023, this language changed: "[XPLR]'s ongoing operations use cash to fund O&M expenses . . . , maintenance capital expenditures, debt service payments and related derivative obligations . . . , distributions to common unitholders and distributions to the holders of noncontrolling interests. [XPLR] *expects to satisfy these requirements primarily with cash on hand and cash generated from operations*" (emphasis added). XPLR, therefore, removed buyouts from being covered by "internally generated cash flow," and further by "cash on hand and cash generated from operations," indicating that as early as March 2023, Defendants were no longer considering XPLR's cash as a means of paying for the buyouts.

131. In September 2023, XPLR's book value dropped from a positive percentage to -22%, and continued to drop thereafter until at least December 31, 2024, as described in Paragraph 89 above.

132. The negative book value indicated that XPLR's liabilities exceeded its assets, and further issuance of units would dilute unitholders.

133. Further, XPLR planned to buy out two CEPFs and one partial CEPF between 2025 and 2026, totaling about $1.3 billion.

134. The buyouts associated with the remaining CEPFs totaled about $3.675 billion between 2027 to 2034.

135. In total, XPLR needed about $5 billion between 2025 and 2034 to buy out the CEPFs without issuing new equity that could dilute unitholders.

20

FIRST AMENDED CLASS ACTION COMPLAINT

136.   Moreover, XPLR had about $3.4 billion ($1.6 billion at 0.78% and $1.8 billion at 4.22%) in debt that was to mature through 2027, which would require taking out additional debt amid elevated interest rates.

137.   XPLR needed liquidity to buy out the CEPFs without diluting unitholders or taking on large debt at high interest rates.

138.   At the end of 2022, XPLR had only about $226 million of cash on hand; in 2023, it had about $274 million; and in 2024, it had about $283 million.

139.   XPLR's total current assets (including cash on hand) were about $1.86 billion in 2022, about $2.2 billion in 2023, and about $860 million in 2024.

140.   Most of XPLR's additional assets, however, were long term assets that it could not utilize for CEPF buyouts (about $21 billion in 2022, over $20 billion in 2023, and about $19 billion in 2024).

141.   In 2022, among other payments, XPLR paid about $1.050 billion in operating expenses and over $1.5 billion in debt payments.  It had only about $634 million in CAFD.

142.   XPLR had only about $375 million in cash available after distributions in 2023, and $296 million in 2024.

143.   In 2023, among other payments, XPLR paid about $1.106 billion in operating expenses and over $1.5 billion in debt payments, totaling over $2 billion. It had only about $689 million left over in CAFD.

144.   In 2024, among other things, XPLR paid about $1.702 billion in operating expenses and about $1.3 billion in debt payments, totaling $1.8 billion.  It utilized the CSCS funds to increase its cash flow.

145.   XPLR's operating income decreased and became negative in 2023 and dropped even further in 2024, -$28 million and -$459 million, respectively, eliminating further the possibility of funds for CEPF buyouts.

21

FIRST AMENDED CLASS ACTION COMPLAINT

146.   XPLR's net income also drastically decreased from 2022 to 2024, going from $1.121 billion, to $218 million, and dropping to -$411 million, respectively, eliminating further the possibility of funds for CEPF buyouts.

147.   Given XPLR's aforementioned financial responsibilities and low liquidity, and as Defendants admitted in January 2025, XPLR needed cash to buy out the CEPFs, which totaled about $5 billion, without diluting unitholder value.

148.   On May 8, 2023, XPLR announced that it would shift its focus solely to renewable energy projects and sell its natural gas pipeline interests.  XPLR would then use the proceeds from those sales to buy out certain CEPFs and for general corporate purposes, so that it would not have to issue additional equity through the end of 2024.

149.   XPLR did sell its Texas natural gas pipeline in December 2023 for about $1.8 billion, with net proceeds of about $1.4 billion.

150.   However, XPLR needed billions more to meet the CEPF buyouts—liquidity that it did not have under the yieldco model.

## IV.   Defendants Take Steps to Temporarily Maintain XPLR's Yieldco Model While Unwinding the Yieldco Model

### A.   NEE Benefited Financially Through XPLR

151.   From at least 2023, NEE sought to expand its projects and developments.  NEE, therefore, sought to obtain financing for its various projects and developments.  Since NEE financially benefited from XPLR, disclosing XPLR's financial failure would jeopardize NEE's ability to obtain financing on agreeable terms or at all as it would indicate NEE's financial instability.  Due to this, Defendants misrepresented XPLR's financial condition and took steps to keep XPLR afloat in its yieldco form until NEE received its financing.

152.   NEE benefited from XPLR via, among other things, receipt of distributions, management fees, IDR fees, capital recycling, and ability to borrow cash pursuant to the CSCS.

22

FIRST AMENDED CLASS ACTION COMPLAINT

153. At least one analyst (Scotia Bank) stated that they viewed XPLR as a tool to support NEE.

154. According to Seaport Research Partners, as of June 2024, NEER would need over about $20 billion in capital expenditure (money required to acquire, upgrade, or maintain long term assets) to replace the cash flow it was collecting from XPLR. The article further noted that NEE deemphasized XPLR in its investment pitch, but did include XPLR's EBITDA and Earnings Per Share ($1 billion and $0.25 respectively) in NEER's and NEE's earnings.

155. In 2021 alone, NEE recycled about $1.7 billion in capital through XPLR. In 2022 alone, NEE recycled about $996 million through XPLR.

156. Further, in 2022, NEE obtained about $163 million in management related fees from XPLR; in 2023, it obtained about $51 million in management related fees; and in 2024, it obtained about $8 million in same.

157. In 2022, NEE obtained about $7 million in CSCS fee income, about $8 million in 2023, and about $8 million in 2024.

158. Further, in 2022, NEER held $298 million of XPLR's money under the CSCS agreement, in 2023 it held about $1.5 billion, and in 2024, it held about $127 million.

159. Between 2022 and 2024, NEE obtained over $12 million from XPLR distributions.

160. NEE also obtained tax benefits from its relationship to XPLR by avoiding double taxation on its projects and benefiting from XPLR's negative taxation, amongst other things.

**B.    Defendants Hid XPLR's Financial Condition to Benefit NEE and Took Steps to Prepare for Distribution Termination**

161. NEE had announced plans for continued investments, products, and large development projects from at least 2023 and beyond.

23

162. For example, in January 2023, Defendant Ketchum stated, regarding NEE, that "[o]ver the next two decades, we are well positioned to continue our long track record of creating long-term value for shareholders through additional renewables and storage investments, expansion into new markets and products that enable even more renewables, and organic growth opportunities to optimize our existing fleet by repowering assets and co-locating storage."

163. In January 2024, Defendant Ketchum stated that NEE is "strategically positioned with outstanding prospects for future growth" and that it is "deploying capital in renewables and transmission."

164. To finance its goals, NEE issued exchangeable senior notes and sold billions in equity to large financial institutions in 2024.

165. Because NEE was deeply intertwined with XPLR, it needed to create an illusion of stability for XPLR, and thus itself, while negotiating financial agreements with large financial institutions.

166. However, in the background, NEER last dropped down a project to XPLR in 2Q 2023.

167. The lack of dropped down projects thereafter indicates that NEE knew starting in at least mid-2023 that XPLR was going to eliminate its yieldco model.

168. In May 2023, NEE announced that it suspended the IDR fee paid to it by XPLR from January 1, 2023 through December 31, 2026, to allegedly allow XPLR additional cash flow to make up for the cash flow that would be lost through the sale of XPLR's natural gas pipeline interests. XPLR also announced a plan to become "the leading 100% renewables pure-play investment opportunity."

169. The May 8, 2023 announcement described a multi-step plan. First, XPLR would sell its STX Midstream and Meade natural gas pipeline assets. Second, XPLR would use the proceeds to buy out its CEPF obligations. Third, the suspended IDR fees would replace the cash flow lost from divesting the pipeline assets.

24

170.   The May 8, 2023 press release further stated that XPLR "continues to expect to grow limited partner distributions per unit by 12% to 15% through at least 2026."[5]

171.   In reality, the timing of the suspension strongly indicates that NEE suspended the IDR fee, at least in part, as a risk management tactic to avoid cutting XPLR's distributions, as it sought financing opportunities for its own projects.

172.   Eliminating the IDR fee allowed XPLR to, for the time being, continue existing in its yieldco form and NEE to control optics, all until NEE closed on its financing in late 2024, followed by the total elimination of XPLR distributions in early 2025.

173.   On September 27, 2023, less than five months after announcing the May 2023 plan, Defendants slowly trickled out the truth when XPLR issued a press release announcing that it was "revising its limited partner distribution per unit growth rate to 5% to 8% per year through at least 2026, with a target growth rate of 6%," from the prior target growth rate of 12-15%.[6]

174.   The September 2023 Press Release attributed the revision to "[t]ighter monetary policy and higher interest rates," which "obviously affect the financing needed to grow distributions at 12%."  Defendant Ketchum stated that the "burden of financing this growth has had an impact on [XPLR's] unit price and yield."

175.   Interest rates, however, were already elevated when Defendants announced the 12-15% distribution growth guidance on May 8, 2023.  In fact, on

[5]   Press Release, XPLR Infrastructure (formerly NextEra Energy Partners, LP), NextEra Energy and NextEra Energy Partners schedule investor conference call and webcast to discuss partnership's outlook; also plan to meet with investors throughout May (May 8, 2023) (the "May 2023 Press Release").

[6]   Press Release, XPLR Infrastructure (formerly NextEra Energy Partners, LP), NextEra Energy Partners, LP revises growth expectations and limits equity needs (Sept. 27, 2023) (the "September 2023 Press Release").

FIRST AMENDED CLASS ACTION COMPLAINT

May 3, 2023, five days before the announcement, the Federal Reserve System raised the federal funds rate to a target range of 5.00% to 5.25%, the highest level since August 2007. By September 27, 2023, the federal funds rate target range had increased by only 25 basis points, to 5.25% to 5.50%.

176. On September 27, 2023, XPLR's unit price declined from a prior-day close of $46.90 to $37.46, a single-day decline of approximately 20%.

177. XPLR then used money from the CSCS balance to contribute to its cash flow, aiding it in distributions and/or expenses throughout 2024, as NEE continued to uphold its illusion of XPLR's stability.

178. In 2023, the CSCS balance was $1.511 billion, and in 2024 it was only $127 million.

179. Between September 27, 2023 and January 27, 2025, Defendants continued to falsely reaffirm the 5% to 8% distribution growth guidance on quarterly earnings calls, including statements made on January 25, 2024, April 23, 2024, and July 24, 2024.

180. As described above, prior to January 28, 2025, the Individual Defendants were executive officers of XPLR.

181. During the relevant period, NEE paid the incentive compensation of XPLR executive officers.

182. In February 2023, NEE's Compensation Committee set performance-based incentive compensation for XPLR's executives for units granted in 2023 based on XPLR's adjusted EBITDA of $400 million for vesting in 2024, 2025, and 2026.

183. However, in March 2024, XPLR's board, which included Defendants Ketchum and Crews, increased this adjusted EBITDA goal for units granted in 2024 from $400 million to $900 million for vesting in 2025, 2026, and 2027.

184. The timing of the change in incentive compensation combined with the Individual Defendants' departure from XPLR support a strong inference that the

FIRST AMENDED CLASS ACTION COMPLAINT

Individual Defendants knew that XPLR was facing a dire financial situation due to its upcoming buyouts of CEPFs and acted to protect NEE from having to pay out incentive compensation on the lower $400 million amount, and instead retain cash if the higher $900 million amount was not met.

**C.    NEE Concludes Its Financial Transaction and the Full Truth is Revealed**

185.    In 2024, NEE raised over $4.4 billion through two types of offerings: a private placement and registered public offerings.

186.    A private placement is a sale of securities to a select group of qualified institutional buyers, instead of the general public, without registration with the SEC. This process bypasses costly and complex public registration requirements.

187.    Qualified institutional buyers are mostly large financial entities such as banks, investment firms, and insurance companies that purchase securities in significant volumes and are presumed to have the expertise to evaluate complex investments.

188.    A registered public offering is a sale of securities registered with the SEC, requiring detailed public disclosures about the issuer's financial condition and business operations.

189.    Regardless of the offering type, investors rely on the accuracy of an issuer's public statements and filings to assess risk and make informed investment decisions.

190.    The success of these offerings depended on investor confidence in NEE's financial health and operational model.  As detailed above, XPLR provided NEE with substantial and ongoing financial benefits, including capital recycling, management and IDR fees, access to cash through the CSCS, and tax advantages.

191.    Disclosing XPLR's true condition and NEE's plan to change XPLR's business model would have revealed to sophisticated institutional buyers that NEE's access to these structural advantages would soon be eliminated.  This information

27

was material to any assessment of NEE's future cash flows, operational flexibility, and overall financial stability.

192. On February 27, 2024, NEE subsidiary NextEra Energy Capital Holdings, Inc. announced the pricing of $900 million in aggregate principal amount of exchangeable senior notes in a private placement to qualified institutional buyers.

193. On June 18, 2024, NEE announced the sale of equity units totaling $2 billion to Wells Fargo Securities, LLC and BofA Securities, Inc. with the transaction expected to close two days later.  This was a public offering.

194. On October 29, 2024, NEE announced that it was to sell $1.5 billion of equity units to J.P. Morgan Securities LLC, Mizuho Securities USA LLC, and Goldman Sachs & Co. LLC.  This final transaction closed on October 31, 2024.  This was a public offering.

195. Less than three months later, on January 28, 2025, XPLR suspended its distributions, changed its name and executives, and changed its business model.  The press release announced a "strategic repositioning" and stated that XPLR was "moving from a business model that focused almost entirely on raising new capital to acquire assets while distributing substantially all of its excess cash flows to unitholders to a model in which XPLR Infrastructure utilizes retained operating cash flows to fund attractive investments," and confirmed that no acquisitions were made in 2024.[7]

196. The January 2025 Press Release announced "the suspension of distributions to unitholders for an indefinite period."

197. XPLR's true financial condition was finally revealed, and its unit price plummeted.

---

[7]    Press Release, XPLR Infrastructure, XPLR Infrastructure, LP announces strategic repositioning. (Jan. 28, 2025) (the "January 2025 Press Release").

FIRST AMENDED CLASS ACTION COMPLAINT

**DEFENDANTS MAKE MATERIAL MISREPRESENTATIONS TO INVESTORS DURING THE CLASS PERIOD WHILE NEE PREPARES FOR DISTRIBUTION TERMINATION**

198. As set forth below, throughout the Class Period, Defendants made a series of statements that misled investors about the stability of XPLR's yieldco model and its ability to continue to pay unitholder distributions through at least 2026. Defendants' repeated assurances that XPLR would continue to increase its distributions to unitholders and maintain the yieldco model were false and misleading. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPLR could not sustain its yieldco business model; (ii) Defendants had entered into financing arrangements that could not be resolved without suspension of distributions; and (iii) Defendants had determined, no later than May 2023, that cash distributions to investors would be eliminated.

**I.      Defendants Make Material Misrepresentations in May 2023**

199. The Class Period begins on May 8, 2023. On that date, XPLR issued the May 2023 Press Release in which Defendant Ketchum stated: "[XPLR] continues to see 12% to 15% growth per year in limited partner distributions per unit as being a reasonable range of expectations through at least 2026."

200. The foregoing statement in Paragraph 199 was false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model were secure and would see growth "through at least 2026." In fact, however, Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding this inevitability and were prolonging XPLR's yieldco structure by foregoing IDR fees to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects. Disclosing the true financial condition of XPLR would have caused NEE to appear less financially

FIRST AMENDED CLASS ACTION COMPLAINT

solvent to financial institutions, jeopardizing favorable terms for the financial transactions that it was seeking.

## II. Defendants Make Material Misrepresentations in September 2023

201. On September 27, 2023, XPLR issued the September 2023 Press Release, lowering its distributions. The September 2023 Press Release quoted Defendant Ketchum who stated, "[XPLR] is revising its long-term growth rate expectations for limited partner distributions to increase its flexibility as it continues to execute on its growth opportunities."

202. Defendant Ketchum further stated that "[t]ighter monetary policy and higher interest rates obviously affect the financing needed to grow distributions at 12%, and the burden of financing this growth has had an impact on [XPLR's] unit price and yield. In the current market environment, the partnership believes revising its growth expectations for now is the appropriate decision for unitholders and better positions it to continue to deliver long-term value."

203. The foregoing statement in Paragraph 202 was false and misleading because it conveyed that interest rates had affected the change in distribution growth rate expectations. However, interest rates were already elevated when Defendants announced the 12-15% distribution growth rate guidance on May 8, 2023. In fact, on May 3, 2023, five days before the May 8, 2023 announcement, the Federal Reserve System raised the federal funds rate to a target range of 5.00% to 5.25%, the highest level since August 2007. By September 27, 2023, the federal funds rate target range had increased by only 25 basis points, to 5.25% to 5.50%. In reality, while blaming interest rates, Defendants were preparing to terminate distributions but were doing so slowly, by trickling out the truth. Defendants were hiding this inevitability and was prolonging XPLR's yieldco structure by lowering, but not yet eliminating, distribution growth guidance, to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects. Disclosing the true

30

FIRST AMENDED CLASS ACTION COMPLAINT

financial position of XPLR and eliminating distributions at this time would have caused NEE to appear less financially solvent to financial institutions, jeopardizing favorable terms for the financial transactions that it was seeking.

204. The September 2023 Press Release announced that it was "revising its limited partner distribution per unit growth rate to 5% to 8% per year through at least 2026, with a target growth rate of 6%."

205. The foregoing statement in Paragraph 204 was false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model were secure "through at least 2026."  In fact, however, Defendants already knew that they were unable to maintain the 6% distribution growth rate through 2026 while conducting the CEPF buyouts, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding this inevitability and was prolonging XPLR's yieldco structure by lowering, but not yet eliminating, distribution growth guidance, to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.  Disclosing the true financial position of XPLR and eliminating distributions at this time would have caused NEE to appear less financially solvent to financial institutions, jeopardizing favorable terms for the financial transactions that it was seeking.

206. The September 2023 Press Release also stated that "[b]y reducing its growth rate and executing on its previously announced transition plans as outlined in May [2023], which includes the sale of the natural gas pipelines and the buyouts of the convertible equity portfolio financing payments due through 2025, [XPLR] does not expect to require growth equity to meet its revised growth expectations until 2027."

207. The foregoing statement in Paragraph 206 was false and misleading because XPLR's plans to address its CEPF financing through 2025, and its

FIRST AMENDED CLASS ACTION COMPLAINT

expectation not to require growth equity until 2027, conveyed to investors that XPLR's unitholder distributions and yieldco model were secure, and that XPLR had a plan for dealing with the CEPF buyouts which did not include the termination of distributions. In fact, however, Defendants already knew that they were unable to maintain the distribution growth rate while conducting the CEPF buyouts and planned to tackle the CEPF buyouts, in part, using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model.

208. The September 2023 Press Release further stated that "[XPLR] also plans to repower the majority of its wind portfolio in the coming years, which it believes can be accomplished at attractive cash available for distribution (CAFD) yields. It also expects to continue to look to acquire wind, solar and storage assets from NextEra Energy . . . and other third parties at favorable yields."

209. The foregoing statement in Paragraph 208 was false and misleading because it conveyed to investors that XPLR would continue to have unitholder distributions. In reality, Defendants already knew that they were unable to maintain the distributions while conducting the CEPF buyouts, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. In fact, NEER was no longer dropping down projects to XPLR at this point, indicating that Defendants knew that XPLR could not even sustain the purchase of a new project.

210. About this, the September 2023 Press Release further quoted Defendant Ketchum as stating that "[r]educing growth expectations will allow [XPLR] to focus on higher-yielding growth opportunities, such as organic repowerings in the short-to medium-term, and reduce new capital requirements." Defendant Ketchum continued: "Over the near and longer term, NextEra Energy['s] industry-leading portfolio of renewables projects, which is expected to total up to 58 gigawatts

32

FIRST AMENDED CLASS ACTION COMPLAINT

through 2026, together with organic growth and third-party acquisitions, will continue to provide [XPLR] with excellent growth opportunities. Through continued execution of its plans, [XPLR] is charting a course to a sustainable future with significant growth visibility."

211. The foregoing statements in Paragraph 210 were false and misleading because they conveyed to investors that XPLR would continue with unitholder distributions and its yieldco model through at least 2026. In reality, Defendants already knew that they would be unable to maintain any distributions growth rate through 2026 while conducting the CEPF buyouts, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model.

## III.    Defendants Make Material Misrepresentations in January 2024

212. During the January 25, 2024 Call, Defendant Ketchum stated that XPLR was focused on "executing against the partnership's transition plans and delivering an LP distribution growth target of 6% through at least 2026."

213. The foregoing statement in Paragraph 212 was false and misleading because it conveyed to investors that XPLR was to remain a yieldco, and its distribution target growth rate was to remain at 6% "through at least 2026." In reality, Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, by using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and was prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

FIRST AMENDED CLASS ACTION COMPLAINT

214. Defendant Crews further stated that XPLR "continue[s] to see 5% to 8% growth per year in LP distributions per unit with a current target of 6% growth per year as being a reasonable range of expectations through at least 2026. We continue to expect the partnership's payout ratio to be in the mid-90s through 2026."

215. The foregoing statement in Paragraph 214 was false and misleading because it conveyed to investors that XPLR was to remain a yieldco, and its distribution target growth rate was to remain at 6% "through at least 2026." In reality, Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, by using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

216. Defendant Ketchum also assured investors that XPLR "does not expect to need an[] acquisition in 2024 to meet the 6% growth and LP distributions per unit target, and the partnership does not expect to require growth equity until 2027."

217. The foregoing statement in Paragraph 216 was false and misleading because it conveyed to investors that XPLR's unitholder distribution and yieldco model were secure. Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, by using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep

34

FIRST AMENDED CLASS ACTION COMPLAINT

XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

## IV.   Defendants Make Material Misrepresentations in April 2024

218.   During the April 23, 2024 Call (the "April 2024 Call"), Defendant Crews stated that XPLR "continue[s] to focus on executing against the partnership's transition plan and delivering an LP distribution target of 6% through at least 2026" and that XPLR had "sufficient proceeds available" to complete financing buyouts in 2024 and 2025.

219.   The foregoing statement in Paragraph 218 were false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model were secure through at least 2026.  In reality, Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model.  Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

220.   As to unitholder distributions, Defendant Crews stated that XPLR "does not expect to need an acquisition this year to achieve a 6% targeted growth rate and the partnership does not expect to require growth equity until 2027."  He further explained that "[f]rom a base of our fourth quarter 2023 distribution per common unit at an annualized rate of $3.52, we continue to see 5% to 8% growth per year in LP distributions per unit, with a current target of 6% growth per year as being a range of expectation for at least 2026" and that XPLR "continue[d] to expect the partnerships payout ratio to be in the mid-90s through 2026."

FIRST AMENDED CLASS ACTION COMPLAINT

221. The foregoing statements in Paragraph 220 were false and misleading because they conveyed to investors that XPLR's unitholder distributions and yieldco model were secure through at least 2026. In reality, Defendants already knew that they were unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, and were preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

222. During the April 2024 Call, an analyst from Guggenheim asked whether XPLR was "advancing any longer-term resolution plans for the CEPF[s]." Defendant Ketchum answered that XPLR had "talked about private capital raise potentially being a solution to address" the CEPFs, that there was "a lot of interest in that," and that "those discussions continue to move forward."

223. The foregoing statements in Paragraph 222 were false and misleading because they conveyed to investors that there was interest in a private capital raise, but omitted that XPLR would be eliminating distributions as part of the actual solution. In reality, Defendants already knew that they would be unable to maintain distributions while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, using what would have been unitholder distributions, and were preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model.

**V.    Defendants Make Material Misrepresentations in July 2024**

224. During the July 24, 2024 Call (the "July 2024 Call"), Defendant Bolster stated that XPLR "continues to see 5% to 8% growth per year in LP distributions

36

per unit with a current target of 6% growth per year as being a reasonable range of expectations through at least 2026."

225. The foregoing statement in Paragraph 224 was false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model were secure through at least 2026. In reality, Defendants already knew that they would be unable to maintain the distribution growth rate through 2026 while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

226. Defendant Bolster also stated that "[i]n terms of next steps" for XPLR, "the partnership is continuing to look at all options to secure a competitive cost of capital" and "address the remaining convertible equity portfolio financing buyouts," the "6% distribution growth target remains for now," and XPLR "does not need an acquisition-related financing in 2024 to meet its 6% target and does not need [growth] equity until 2027."

227. The foregoing statements in Paragraph 226 were false and misleading because they conveyed to investors that XPLR's unitholder distributions and yieldco model were secure, and omitted that Defendants planned to use unitholder distributions for CEPF buyouts. In reality, Defendants already knew that they would be unable to maintain distributions while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, by using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the

FIRST AMENDED CLASS ACTION COMPLAINT

inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

228. In response to an analyst's question during the July 2024 Call about resolving XPLR's CEPFs and what Defendant Bolster meant when he said "distribution growth target remains *for now*" (emphasis added), Defendant Ketchum assured investors that "[t]he good thing is that we have time. We have time in 2024. We've said to the market, we don't have to do anything. We don't have any drops planned for '24, don't have growth equity needs until '27."

229. The foregoing statement in Paragraph 228 was false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model remained secured, and that XPLR had enough equity until 2027. In reality, Defendants already knew that they would be unable to maintain distributions while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model. Defendants were hiding the inevitability of distribution termination and were prolonging XPLR's yieldco structure by continuing to relay false distribution growth guidance to keep XPLR functioning as a yieldco while NEE sought financing opportunities for its projects.

**VI.    Defendants Make Material Misrepresentations in October 2024**

230. During the October 23, 2024 Call (the "October 2024 Call"), Defendant Bolster stated that "[t]he partnership also continues to evaluate alternatives to address its remaining convertible equity portfolio financing obligations and its cost of capital, focusing on its capital structure and the potential for redeployment of more cash flow toward driving organic cash flow growth. Given the demand for power, [XPLR] has many ways in which it can seek to grow, which could include

not only acquiring assets, but also wind repowerings and potentially other organic growth opportunities. [XPLR] plans to complete its review by no later than the fourth-quarter 2024 call and intends to provide its distribution and run-rate cash available for distribution expectations at that time."

231. The foregoing statement in Paragraph 230 was false and misleading because it conveyed to investors that XPLR's unitholder distributions and yieldco model were secure, notwithstanding XPLR's review of its financing options, which allegedly were numerous. Further, the statements omitted that Defendants planned to use unitholder distributions for CEPF buyouts. In reality, Defendants already knew that they would be unable to maintain distributions while conducting the CEPF buyouts, planned to tackle the CEPF buyouts, in part, by using what would have been unitholder distributions, and were in fact preparing NEE for the forthcoming termination of distributions and elimination of the yieldco model.

### THE TRUTH EMERGES

232. The partial undisclosed truth emerged on September 27, 2023, when XPLR issued the September 2023 Press Release, lowering its distributions. The September 2023 Press Release announced that XPLR was "revising its limited partner distribution per unit growth rate to 5% to 8% per year through at least 2026, with a target growth rate of 6%." Defendants, however, were only trickling out the truth—and not yet disclosing that they planned to eliminate all distributions.

233. On this news, the price of XPLR's common units fell from a closing price of $46.9 per unit on September 26, 2023 to a closing price of $37.46 per unit on September 27, 2023—a decline of $9.44 per unit, or 20.13%.

234. The undisclosed truth fully emerged on January 28, 2025, when XPLR shocked investors by announcing that it would suspend entirely cash distributions to common unitholders and essentially abandon its yieldco model.

FIRST AMENDED CLASS ACTION COMPLAINT

235. Specifically, XPLR issued the January 2025 Press Release announcing a "strategic repositioning" and stating that it was "moving from a business model that focused almost entirely on raising new capital to acquire assets while distributing substantially all of its excess cash flows to unitholders to a model in which XPLR Infrastructure utilizes retained operating cash flows to fund attractive investments."

236. The January 2025 Press Release continued: "Accordingly, XPLR Infrastructure is announcing the suspension of distributions to unitholders for an indefinite period. By taking these actions today, XPLR Infrastructure adopts a plan that eliminates the need for equity issuances."

237. The January 2025 Press Release quoted Defendant Ketchum as stating: "We believe today's strategic repositioning of XPLR Infrastructure's business model will unlock the value of the strong cash flows in the existing portfolio and best position the partnership to allocate cash flow optimally for unitholders in the future." Ketchum continued, "Suspending the distribution is a decision we do not take lightly.  However, by doing so, the partnership will have a consistent source of capital which it can invest back in the business at attractive returns.  We believe using our excess cash flow to buy out selected convertible equity portfolio financings and invest in our existing portfolio of high-quality assets are our best and most immediate value-enhancing opportunities for unitholders.   Beyond these investments, we expect to have many other opportunities to reinvest our cash flow driven by the unprecedented demand for power in our country and the infrastructure required to serve it.  The changes we are announcing today are intended to eliminate the need to issue equity, while enabling the partnership to both preserve its balance sheet capacity to facilitate near-term financings and maintain greater financial flexibility in the future to maximize unitholder value."

40

FIRST AMENDED CLASS ACTION COMPLAINT

238. In addition, XPLR announced that it had appointed a new CEO and CFO.

239. Also on January 28, 2025, XPLR held a conference call for investors and analysts, during which Defendant Bolster stated:

> When XPLR was established in 2014, we expected its basic function to be to acquire contracted clean energy assets and to hold those assets in a portfolio that delivered relatively low risk and growing cash flows. Other opportunities for growth, of course, were not ruled out, but this is expected to be the main path to growth at least for some years.
>
> Explicit in this model of growth driven by acquisitions was the commitment to pay out a very high proportion of annual cash flows, which necessarily meant that every new acquisition would bring with it a need for new equity issuances. For many years, this model worked. However, as distributions per unit grew, the partnership needed to acquire more assets and thus issue more equity to support its distribution growth rate. As our equity needs grew, the existing public equity market for yieldcos proved to be more limited, creating the need for substantial discounting and thus increased dilution. Therefore, we look to private capital as a financing source to help support our growing equity needs and maintain our distribution growth rate.
>
> When issued, the CEPF offered a new equity -- offered new equity capital to support acquisitions. Unfortunately, as we began to buy out CEPF obligations by issuing equity in 2021, there was significant downward selling pressure on the unit price. If we had continued to issue equity to buy out the CEPF, it would have resulted in significant dilution to unitholders. Over this time, it has become clear that utilizing the significant cash available to XPLR to fund these buyouts, instead of distributing that cash and issuing new equity, results in what we believe is a better economic value proposition for unitholders over the longer term.

41

FIRST AMENDED CLASS ACTION COMPLAINT

240.   The foregoing disclosures shocked the market.   As reported in one of several *Bloomberg* articles addressing XPLR that day, the cash distribution suspension "marked the first time the company had cut or suspended its distribution, according to a representative," and "[c]onsensus expectations had been for a 34% cut."[8]   In other words, although the market had anticipated a cut to XPLR's cash distribution, it had been unprepared for a complete *suspension* of that distribution, all at once, after XPLR's consistent history of consecutively raising its cash distribution, despite its CEPF obligations.

241.   On this news, the price of XPLR's common units fell from a closing price of $15.80 per unit on January 27, 2025 to a closing price of $10.49 per unit on January 29, 2025—a decline of $5.31 per unit, or nearly 35%.

242.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the XPLR's common units, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

243.   Plaintiff brings this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired XPLR common units during the Class Period, that was damaged upon the revelation of the alleged corrective disclosures.[9]   Excluded from the Class are Defendants herein, the officers and directors of XPLR, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

---

[8]   Josh Saul & Will Wade, *XPLR Slumps After Pausing Investor Payouts on Strategy Shift*, BLOOMBERG (Jan. 28, 2025) https://news.bloombergtax.com/in-house-counsel/xplr-slumps-after-pausing-investor-payouts-on-strategy-shift-1?context=search&index=0.

[9]   Fed. R. Civ. P. 23(a), (b)(3).

244. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, XPLR common units were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by XPLR or its transfer agent and may be notified of the pendency of this Action by mail and/or email, using the form of notice similar to that customarily used in securities class actions.

245. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

246. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

247. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of XPLR;

- whether the Individual Defendants caused XPLR to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

43

- whether the price of XPLR common units was inflated during the Class Period due to Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

249. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- XPLR common units traded in an efficient market;

- XPLR's common units were liquid and traded with moderate to heavy volume during the Class Period;

- XPLR traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of XPLR's common units; and

- Plaintiff and members of the Class purchased, acquired and/or sold XPLR common units between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

250. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44

251. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## UNDISCLOSED ADVERSE FACTS

252. The market for XPLR's common units was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, XPLR's common units traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of XPLR's common units and market information relating to XPLR, purchased or otherwise acquired XPLR's common units and were damaged thereby.

253. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of XPLR's common units, by publicly issuing false and/or misleading statements and/or omitting material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about XPLR's business, operations, and prospects as alleged herein.

254. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about XPLR's financial well-being and prospects. These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of

45

FIRST AMENDED CLASS ACTION COMPLAINT

XPLR and its financial well-being and prospects, including its viability as a yieldco and its ability to continue paying unitholder distributions through 2026, thus causing XPLR's common units to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing XPLR's common units at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## <u>LOSS CAUSATION</u>

255. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiff and the Class purchased XPLR's common units at artificially inflated prices and were damaged thereby. The price of XPLR's common units significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

256. Throughout the Class Period, investors were unaware that XPLR's yieldco model was failing and that XPLR would have to terminate distributions in order to meet its CEPF buyout obligations.

257. Defendants' misrepresentations and omissions, as alleged herein, misrepresented and concealed the true adverse facts from the market during the Class Period, leading investors to wrongly believe that XPLR would continue to maintain its yieldco model and distributions. In reality, it could sustain neither.

258. As alleged above, these material facts were partially revealed to investors on September 27, 2023 when XPLR announced it was lowering its distribution growth rate from 12-15% to "5% to 8% per year through at least 2026, with a target growth rate of 6%."

FIRST AMENDED CLASS ACTION COMPLAINT

259. On this news, the market reacted swiftly and negatively, with XPLR's unit price declining from a prior-day close of $46.90 to $37.46, a single-day decline of approximately 20%.

260. Between September 27, 2023, and January 27, 2025, Defendants reaffirmed the 5% to 8% distribution growth guidance on quarterly earnings calls.

261. On January 28, 2025, the truth was finally revealed when XPLR issued the January 2025 Press Release announcing a "strategic repositioning," confirming it had made no acquisitions in 2024, and announcing "the suspension of distributions to unitholders for an indefinite period."

262. On this news, the market reacted swiftly and negatively, with XPLR's unit price declining from a prior-day close of $15.80 to $11.83, a single-day decline of approximately 25%. By the end of January 29, 2025, the unit price declined even further, to $10.49, a total decline of nearly 35%.

263. These disclosures were the materialization of the previously concealed risks concealed by Defendants' material misstatements and omissions as alleged herein.

264. From May 8, 2023 to January 29, 2025, XPLR's unit price declined from $30.13 per unit to $11.83 per unit, a decline of over 65%.

**<u>ADDITIONAL SCIENTER ALLEGATIONS</u>**

265. As alleged herein, Defendants acted with scienter since Defendants: (i) knew that the public documents and statements issued or disseminated in the name of XPLR were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Throughout the Class Period, Defendants knew that they were

FIRST AMENDED CLASS ACTION COMPLAINT

making misrepresentations and omissions, as they knew that distributions and the yieldco model must be eliminated.

266. As set forth above in Paragraphs 9, 70-72, and 74, the Individual Defendants were the most senior management at XPLR, and were executives, officers, and/or directors of NEE and its affiliates. Defendants disclosed that the Individual Defendants could prioritize NEE's interests above those of XPLR. Due to their roles, Defendants were privy to confidential proprietary information concerning XPLR and NEE, and made decisions on XPLR's behalf.

267. As described above in Paragraphs 151-197, Defendants were incentivized to keep XPLR's failing yieldco structure a secret as they were attempting to obtain financing for NEE's projects and development. In fact, Defendants kept XPLR afloat by cutting IDR fees, utilizing cash from the CSCS agreement, and lowering distribution growth rates. While keeping XPLR's yieldco model functional, however, Defendants kept reassuring investors that distributions would grow, and omitted that XPLR could not pay for the CEPF buyouts while maintaining distributions, and had to, in fact, terminate the distributions. Defendants continued to misrepresent that the yieldco model and distributions were safe. After obtaining over $4.4 billion in financing in late 2024 for NEE, Defendants revealed the truth a mere three months later.

## **NO SAFE HARBOR**

268. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Certain of the statements alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, there was not meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the

FIRST AMENDED CLASS ACTION COMPLAINT

purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of XPLR who knew that the statement was false when made.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

269.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

270.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.[10]

271.    During the Class Period, Defendants: (i) engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; (ii) made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XPLR common units; and (iii) cause Plaintiff and

---

[10]    15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.

49

FIRST AMENDED CLASS ACTION COMPLAINT

other members of the Class to purchase or otherwise acquire XPLR common units at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct each of the Defendants took the actions set forth herein.

272. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for XPLR common units. These statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about XPLR's finances and business prospects.

273. By virtue of their positions at XPLR, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts that would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

274. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the executives of XPLR and/or NEE, the Individual Defendants had knowledge of the details of XPLR's internal affairs.

275. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the

FIRST AMENDED CLASS ACTION COMPLAINT

content of the statements of XPLR.  As officers and/or directors of a publicly held entity, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to XPLR's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading public statements, the market price of XPLR common units was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning XPLR's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired XPLR common units at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

276.   During the Class Period, XPLR common units traded in an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired common units of XPLR at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of XPLR common units was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of XPLR common units declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

FIRST AMENDED CLASS ACTION COMPLAINT

277. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[11]

278. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the XPLR's common units during the Class Period, upon the disclosure that XPLR had been disseminating misrepresented information to the investing public.

## **COUNT II**
### **(Violations of Section 20(a) of the Exchange Act Against All Defendants)**

279. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

280. During the Class Period, the Individual Defendants and NEE participated in the operation and management of XPLR, and conducted and participated, directly and indirectly, in the conduct of XPLR's business affairs. Because of their senior positions and general corporate control over XPLR, they knew the adverse non-public information about XPLR's misstatements.

281. As officers and/or directors of a publicly owned entity, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to XPLR's financial condition and results of operations, and to correct promptly any public statements issued by XPLR which had become materially false or misleading.

282. Because of their positions of control and authority as senior officers and NextEra Energy's general corporate control over XPLR, the Individual Defendants and NEE were able to, and did, control the contents of the various public statements which XPLR disseminated in the marketplace during the Class Period. Throughout

---

[11]    15 U.S.C. § 78j(b); 17 C.F.R. §240.10b-5.

the Class Period, the Individual Defendants and NEE exercised their power and authority to cause XPLR to engage in the wrongful acts complained of herein. The Individual Defendants and NEE, therefore, were "controlling person[s]" of XPLR within the meaning of Section 20(a) of the Exchange Act.[12] In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of XPLR common units.

283. Each of the Individual Defendants and NEE, therefore, acted as a controlling person of XPLR. By reason of their senior management positions and general corporate control over XPLR, each of the Individual Defendants and NEE had the power to direct the actions of, and exercised the same to cause, XPLR to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants and NEE exercised control over the general operations of XPLR and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

284. In addition, XPLR controlled the Individual Defendants and its other officers and employees.

285. By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.[13]

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class demand judgment against Defendants as follows:

A.    determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

---

[12]    15 U.S.C. §78t(a).

[13]    *Id.*

53

B.      requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff and the Class hereby demand a trial by jury.


DATED: January 16, 2026        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Karolina Klyuchnikova
Thomas L. Laughlin, IV (*pro hac vice*)
Karolina Klyuchnikova (*pro hac vice*)
Logan Rudman (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
tlaughlin@scott-scott.com
kklyuchnikova@scott-scott.com
lrudman@scott-scott.com

John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiff*
*James Alvrus and the Proposed Class*

54

FIRST AMENDED CLASS ACTION COMPLAINT

Brian J. Schall (CA 290685)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Plaintiff James Alvrus*

55