**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
Jonathan S. Tam (CA 304143)
2029 Century Park East
Los Angeles, CA 90067
Telephone: 310-982-4346

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ALVRUS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> XPLR INFRASTRUCTURE, LP f/k/a NEXTERA ENERGY PARTNERS, LP, JOHN W. KETCHUM, BRIAN W. BOLSTER, TERRELL KIRK CREWS II, and NEXTERA ENERGY, INC., <br><br> Defendants. | Case No. 3:25-cv-01755-JLS-DDL <br><br> **DEFENDANTS' NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> **Oral Argument Requested** <br><br> Date: June 18, 2026 <br> Time: 1:30 PM <br> Courtroom: 4D <br> Judge: Hon. Janis L. Sammartino |

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL

## NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 18, 2026 at 1:30 PM, or as soon thereafter as the matter may be heard, Defendants XPLR Infrastructure, LP f/k/a NextEra Energy Partners, LP, John W. Ketchum, Brian W. Bolster, Terrell Kirk Crews II, and NextEra Energy, Inc. will and hereby do move this Court, pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), for an order dismissing Plaintiff James Alvrus's First Amended Complaint in the above-captioned action, without leave to amend.

In support of this Motion, Defendants rely on, and file herewith, the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the First Amended Complaint.

The grounds for this Motion are as follows:

*First*, the Complaint fails to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934;

*Second*, the Complaint fails to plead fraud with the level of particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995.

This Motion is based upon Defendants' Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Audra J. Soloway in Support of Defendants' Motion to Dismiss and the exhibits thereto, the complete files and records in this action, and such other argument and matters as the Court may consider.

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                                                    i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND ...................................................................................4

I.    OVERVIEW OF XPLR'S BUSINESS ......................................................4

II.    XPLR ENTERS AND DISCLOSES CEPF ARRANGEMENTS ................6

III.    MAY 2023: XPLR ANNOUNCES LOWER DISTRIBUTION GROWTH EXPECTATIONS AND PLANS TO BUY OUT THREE CEPFS WITHOUT ISSUING EQUITY ................................................6

IV.    SEPTEMBER 27, 2023: XPLR CUTS ITS TARGET ANNUAL DISTRIBUTION GROWTH RATE ..............................................................8

V.    JANUARY 2024 – OCTOBER 2024: XPLR DISCLOSES ITS EVALUATION OF THE CEPF OBLIGATIONS AND ENHANCES ITS RISK DISCLOSURES ...............................................................................8

VI.    OCTOBER 23, 2024: XPLR WITHDRAWS ITS DISTRIBUTION PROJECTION ...........................................................................................10

VII.    JANUARY 28, 2025: XPLR SUSPENDS DISTRIBUTIONS, SHIFTS TO GROWTH MODEL.........................................................................11

LEGAL STANDARD...........................................................................................11

ARGUMENT .......................................................................................................12

I.    NONE OF THE ALLEGED MISSTATEMENTS IS MATERIALLY FALSE OR MISLEADING......................................................................12

    A.    Plaintiff Fails to Allege Any Facts Supporting the FAC's Assertion That Defendants Decided to Suspend Distributions by "May 2023" ...........................................................................12

    B.    The Alleged Misstatements Did Not Convey That Distribution Growth or the Yieldco Model Was "Secure" Through 2026.............13

    C.    All Alleged Misstatements Are Inactionable Opinion Statements .......................................................................................16

D. All Alleged Misstatements Are Protected Forward-Looking Statements ..................................................................................17

II. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ........................................................................19

A. Plaintiff Fails to Meet the PSLRA's Demanding Pleading Standard .................................................................................20

B. Plaintiff Engages in Improper Group Pleading ...................................21

C. The Complaint Contains No Specific Allegations That Any Defendant Believed or Intended His Statements to Be False .............21

D. The Complaint Alleges No Cognizable Motive to Defraud ...............22

E. The Most Compelling Inference Is Not Fraud ...................................25

III. THE COMPLAINT FAILS TO PLEAD LOSS CAUSATION WITH RESPECT TO THE PURPORTED SEPTEMBER 2023 CORRECTIVE DISCLOSURE ................................................................26

IV. THE COMPLAINT FAILS TO ALLEGE ANY STATEMENTS BY NEE ........................................................................................26

V. THE COMPLAINT FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY ..................................................................28

CONCLUSION .............................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson* v. *Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................................12

*United States* v. *Bestfoods*,
524 U.S. 51 (1998)..................................................................................................26, 27

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015) ................................................................................28

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...........................................................................................26

*Cai* v. *Eargo, Inc.*,
2025 WL 66041 (9th Cir. Jan. 10, 2025)..........................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...........................................................................................16

*In re Cloudera, Inc. Sec. Litig.*,
121 F.4th 1180 (9th Cir. 2024) ...................................................................................12, 13

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ...........................................................................................14

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004)..............................................................................18

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...........................................................................11, 18, 19

*In re Dot Hill Sys. Corp. Sec. Litig.*,
2009 WL 734296 (S.D. Cal. Sept. 2, 2008)......................................................................22

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008)........................................................................24, 25

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020) ........................................................................*passim*

*Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund* v. *Clorox Co.*,
  353 F.3d 1125 (9th Cir. 2004) ........................................................................18, 19

*In re Eventbrite, Inc. Sec. Litig.*,
  2020 WL 2042078 (N.D. Cal. Apr. 28, 2020)......................................................4

*In re Ferrellgas Partners, Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127
  (2d Cir. 2019)......................................................................................................18

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994)..................................................................28

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) .............................................................18

*Institutional Invs. Grp.* v. *Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ..............................................................................19

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ........................................................................14, 16

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 134 (1998)...........................................................................................26

*Lipton* v. *Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ..........................................................................28

*Maeve Inv. Co.* v. *Teekay Corp.*,
  2017 WL 5158059 (WD. Wash. Nov. 7, 2017)..................................................14

*Mallen* v. *Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012)..............................................................20

*Mizzaro* v. *Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) .........................................................................20

*Oaktree Principal Fund* v. *Warburg Pincus*,
  2016 WL 6782768 (C.D. Cal. Aug. 9, 2016) .....................................................27

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................16

*In re Optimal U.S. Litigation*,
  2011 WL 4098745 (S.D.N.Y. Oct. 11, 2014).....................................................27

*Prodanova* v. *H.C. Wainwright & Co.*,
   993 F.3d 1097 (9th Cir. 2021) ........................................................20, 21, 22, 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ...................................................................23

*Ronconi* v. *Larkin*,
   253 F.3d 423 (9th Cir. 2001) ...................................................................21

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd*, 816 F.3d 199 (2d Cir. 2016) .........17

*In re Secure Comput. Corp. Sec. Litig.*,
   120 F. Supp. 2d 810 (N.D. Cal. 2000)........................................................18

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...................................................................22

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996) ...................................................................18

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................4, 20, 25

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) ........................................................27

*In re VeriFone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ...................................................................12

*Walker* v. *L Brands, Inc.*,
   2020 WL 6118467 (S.D. Ohio Oct. 16, 2020) ...............................................22

*Webb* v. *Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ...................................................................23

*Weston Fam. P'ship* v. *Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ...................................................................12

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................21

*Zucco Partners* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir.), *as amended* (Feb. 10, 2009) ................................11, 20

## Statutes

15 U.S.C. § 78j(b) ..................................................................................4, 11, 12, 26

15 U.S.C. § 78n(d)(2).....................................................................................18

15 U.S.C. § 78t(a) ......................................................................................4, 28

15 U.S.C. § 78u-4(b)(1) ....................................................................................11

15 U.S.C. § 78u-4(b)(4) ....................................................................................26

15 U.S.C. § 78u-5(i)(1)(A) ...............................................................................18

15 U.S.C. § 78u-5(i)(1)(A), (C)-(D) ...............................................................18

15 U.S.C. § 78u-5(i)(1)(D) ...............................................................................18

15 U.S.C. § 78u-5(c)(1)(A)(i), (B)(i) ...............................................................18

15 U.S.C. § 78u-5(c)(1)(B)(i) ...........................................................................20

## Other Authorities

Fed. R. Civ. P. 9(b) .....................................................................................2, 11

### **PRELIMINARY STATEMENT**

XPLR Infrastructure, LP ("XPLR") is a limited partnership launched in 2014 that acquires clean energy projects. For years, XPLR paid out a substantial portion of cash flow from its projects as distributions to its unitholders (a "yieldco" model). Among other financing products XPLR used to fund its business, XPLR sold partial interests in discrete portfolios of projects to third-party investors. These interests were sold through convertible equity portfolio financings, or "CEPFs"—which were disclosed in real time to XPLR unitholders. In each CEPF, XPLR received an upfront cash payment and the right to receive the majority of cash flows generated by the portfolio for an initial period. If XPLR did not buy out the CEPF investor, either in cash or in XPLR partnership units valued at market price, the cash-flow allocation would "flip" at the end of that period, so that the CEPF investor would thereafter receive the majority of the cash flows. The yieldco model thrived in the then-prevailing low interest-rate environment: due to low interest rates, XPLR could acquire projects at low capital costs, buy out CEPFs with high-value XPLR units, and grow distributions to unitholders.

However, XPLR repeatedly warned unitholders that rising interest rates could challenge its business model, including its ability to make acquisitions and grow distributions, by raising its financing costs. When interest rates began to increase in 2022—lowering the market price for XPLR units—XPLR's cost of capital indeed rose, which made it harder to finance acquisitions and buy out CEPFs without diverting cash from distributions. XPLR disclosed these challenges in real time.

After a year of soaring interest rates, in May 2023, XPLR told investors that it "continue[d] to see 12% to 15% growth per year in . . . distributions per unit as being a reasonable range of expectations through at least 2026," but that, "[g]iven the current capital markets environment, the partnership expects to grow distributions at or near the bottom end of this range." To address the increasing financing challenges it faced, XPLR also told investors that it was implementing a plan that would not require additional equity issuances to finance growth through 2024 or to buy out CEPFs maturing through 2025.

XPLR's cost of capital continued to increase, and XPLR announced in September 2023 that it was reducing its distribution growth target to 6% "for now," so that it would not need to issue growth equity until 2027. Into mid-2024, XPLR reminded investors that its cost of capital needed to improve to sustain its yieldco business model, repeatedly stating that it was "focused on the partnership's cost of capital improving, which is critical for its future success," that it was continuing to "***look at all options*** to secure a competitive cost of capital," and that "the partnership's 6% distribution growth target remains" only "***for now***." With adverse market conditions persisting, XPLR told investors in October 2024 that it was withdrawing its distribution growth target altogether, and "really reflecting on the yieldco model itself and contemplating the strategic shift in how we allocate capital."

Finally, in January 2025, with cost of capital challenges enduring, XPLR determined to change course. It announced a strategic repositioning of its business model, from one based on raising new capital to acquire cash-generating projects and distributing excess cash to unitholders, to one that retains cash flow from projects for its most capital-efficient use—which may include reinvesting in existing assets, buying out CEPFs, making new acquisitions, or (potentially) returning capital to unitholders. XPLR announced that it was suspending its regular distributions, and this more flexible business plan eliminated the need to issue additional equity to finance its projects and address CEPFs. At every stage up to its announcement, XPLR updated unitholders on market headwinds, how those headwinds threatened distributions, and how its plans were evolving.

The FAC does not dispute any of this. Instead, Plaintiff, an XPLR unitholder since October 2024, claims that XPLR's efforts to manage, over this 18-month period, an unprecedented rise in interest rates by taking, and communicating, actions to salvage its yieldco model were a fraud from start to finish. Plaintiff's theory rests on the bare allegation that XPLR had already determined to abandon its yieldco model and suspend distributions by May 2023. But under the PSLRA and Rule 9(b), the Court must disregard this conclusory allegation, which is unsupported by any well-pleaded facts: the FAC offers no particularized allegations of internal documents, meetings, statements, or other evidence

---

that such a decision was made by May 2023, or at any time before the January 2025 announcement. And without this conclusory allegation, the FAC must be dismissed. The hindsight theory that XPLR actually knew by May 2023 that it could no longer maintain the yieldco model and its distributions given the increasing financial pressures is legally insufficient. Tellingly, all of the information on which Plaintiff relies was disclosed by XPLR in real time. For these and other independent reasons, the FAC must be dismissed.

**(1) No False or Misleading Statements or Omissions.** Not one of the alleged misstatements in the FAC is pleaded to be false or misleading under the applicable heightened pleading standards. The majority of the alleged misstatements are nothing more than XPLR's announced targets for unitholder distribution growth through 2026. The remaining alleged misstatements discuss XPLR's investment "plans"; XPLR's "expectations" with respect to equity issuances, CEPF buyouts, and acquisition needs; the cost of capital challenges XPLR was facing; or potential alternative options for funding CEPF buyouts. Plaintiff does not allege with particularity that any of these statements was false when made. His claims turn on the bare allegation that Defendants had determined by May 2023 that they could not maintain the distribution growth rate through 2026 while conducting the CEPF buyouts. But the FAC does not include a single shred of non-conclusory text to support that linchpin assertion. And while Plaintiff strains to cast the challenged statements as "promises" of "secure" distributions, their text and context makes clear that they were not. The challenged statements are also nonactionable opinion statements and forward-looking statements protected from liability under the law.

**(2) No Strong Inference of Scienter.** The FAC also does not satisfy the heightened pleading standards for scienter, *i.e.*, intent to defraud. The FAC does not contain a single factual allegation that any Defendant made any statement knowing it to be false, much less intended to deceive investors. The FAC alleges that the Individual Defendants were beholden to NextEra Energy, Inc. ("NEE") and concealed the truth about XPLR so that NEE could raise money, but that allegation of a routine corporate objective is both conclusory and legally insufficient to plead scienter. It is also entirely illogical: both the

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                          3

Individual Defendants and NEE were XPLR unitholders, and increased their holdings during the Class Period, aligning their incentives with other XPLR unitholders.

**(3) No Loss Causation for September 2023 Alleged Corrective Disclosure.** Plaintiff's claim is based in part on an alleged corrective disclosure made in September 2023 and a subsequent market drop. But Plaintiff did not buy any XPLR units until October 2024. Plaintiff cannot plead loss causation when he did not own any XPLR units at the time of the alleged corrective disclosure and market decline.

**(4) No Claims Against NEE.** Although the FAC asserts a claim for primary liability against NEE, it does not allege a single statement made by that entity. Section 10(b) liability can attach only to the maker of a statement. The FAC does not identify NEE as the maker of any statement, and Plaintiff cannot attribute XPLR's statements to NEE simply because it owns part of XPLR. Moreover, NEE is not adequately pleaded to be a control person such that liability would attach under Section 20(a).

As addressed in detail below, the FAC should be dismissed with prejudice.

## FACTUAL BACKGROUND[1]

### I.   Overview of XPLR's Business

XPLR is a limited partnership that operates clean energy projects designed to generate stable, long-term cash flows for distribution to its unitholders. Ex. A at 12; ¶ 3. XPLR's common units trade publicly on the New York Stock Exchange. ¶ 68. XPLR was launched in June 2014 by NEE. Originally called NextEra Energy Partners, LP ("NEP"), it changed its name to XPLR Infrastructure, LP in January 2025.[2] ¶ 4. During the Class Period, a NEE subsidiary effectively was a slight majority owner of XPLR's common units, and a different NEE subsidiary was XPLR's general partner. Ex. B at 4. While four NEE

---

[1] Citations to paragraph numbers refer to the FAC, ECF No. 38. Citations to "Ex." refer to exhibits to the Soloway Declaration, which this Court can consider because they are documents either incorporated into the FAC by reference or of which the Court can take judicial notice. *See Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020).

[2] "XPLR" is used to refer to the same limited partnership—NEP before the name change and XPLR after. All emphases are added and all citations are omitted unless noted.

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                          4

officers sat on XPLR's seven-member Board, a majority of the Board, including one of the NEE officers, was elected by XPLR common unitholders.[3]

NextEra Energy Management Partners, LP ("NEE Management"), a NEE affiliate, provided management services to XPLR under a Management Services Agreement with XPLR ("MSA"), but XPLR's Board had the final say on all decisions. ¶ 20; Ex. C §§ 3.1, 3.3, 3.42, 5.1. In return, NEE Management received management fees and incentive distribution rights fees ("IDR Fees") from an XPLR subsidiary. ¶ 20.

XPLR operated under a "yieldco" model, meaning that, during the Class Period, XPLR's "primary business objective" was to "acquire ownership interests in contracted clean energy projects from [a NEE affiliate] or third parties that allow[ed] [XPLR] to increase its cash distributions to the holders of its common units over time." Ex. D at 8. Nonetheless, XPLR's 2014 registration statement warned that "[w]hile we believe our targeted growth rate is reasonable, it is based on estimates and assumptions regarding a number of factors, many of which are beyond our control, and we may not be able to grow our business at a rate consistent with our expectations, if at all." Ex. A at 12. And XPLR's limited partnership agreement states that XPLR's Board has sole discretion whether to pay distributions, which are paid out of XPLR's available cash, if any. Ex. E at 9–10. To fund distributions, XPLR needed "a sound capital structure and financial flexibility," so that it could acquire cash-generating energy projects. Ex. D at 8. XPLR thus warned investors that one key risk was that "[XPLR] may not be able to access sources of capital on commercially reasonable terms," which "could have a material adverse effect on [XPLR's] ability to grow its business and make cash distributions to its unitholders." Id. at 18.

XPLR "thrive[d]" for years "in a low-rate environment." ¶ 85; Ex. F. But rising rates increase XPLR's cost of capital, as "[d]ebt is more expensive when interest rates are high." ¶ 85. Rising rates also decrease the value of XPLR units by making other, higher-yield investments more attractive. ¶¶ 127–28. Decreasing unit prices also increase the cost

---

[3] Ex. C. §§ 3.3, 3.4.2. The other three directors were appointed by an entity indirectly controlled by NEE. Ex. B at 4, 18. Three of XPLR's directors were independent of both XPLR and NEE under New York Stock Exchange listing standards. Id.

of capital, as issuing new units at a lower price is more expensive. A yieldco model depends on maintaining a spread between the cost of acquiring an asset and the cash flow generated by that asset. As rising interest rates or falling unit prices increase acquisition costs, the spread tightens, reducing the profitability of any acquisition. XPLR thus warned that "a rising interest rate environment could adversely impact the price of [XPLR]'s common units, [its] ability to issue equity or incur debt for acquisitions or other purposes and [its] ability to make cash distributions to its unitholders." Ex. D at 24.

## II.   XPLR Enters and Discloses CEPF Arrangements

Beginning in 2018, one mechanism XPLR used to fund acquisitions of projects was convertible equity portfolio financings. ¶ 28. Under the CEPF structure, a third-party investor would pay XPLR cash in exchange for an equity stake in an XPLR subsidiary that held a subset of XPLR's projects. ¶ 29. The CEPF investor would receive a minority share of the cash generated by the subsidiary for an initial period, generally three to ten years, with the large majority of cash distributions going to XPLR. *Id*. When that period concluded, XPLR could "buy out" the CEPF investor, either in cash or in XPLR common units. *Id*. If XPLR chose not to buy out the investor by the end of the period (the "flip date"), a substantial portion of the cash distributions would "flip" from XPLR to the investor, providing the investor with a larger share going forward. *Id*.

From 2018 through 2022, XPLR raised a total of approximately $5.7 billion over seven separate CEPFs. ¶ 31. XPLR disclosed the key terms of each CEPF on a Form 8-K and publicly filed each CEPF purchase agreement. *See* Exs. B at 38, G.

XPLR disclosed the risks of CEPFs to XPLR unitholders. In particular, XPLR disclosed that "buying out" CEPF investors could dilute XPLR's common unitholders' equity and decrease XPLR's cash available for distributions. Ex. B at 16; ¶ 33. If XPLR chose to buy out a CEPF with new equity, that could dilute existing unitholders and require more cash for future distributions to unitholders. If it did so with cash, that would decrease the cash that would otherwise be available to be paid out as distributions.

## III.   May 2023:  XPLR Announces Lower Distribution Growth Expectations and

**Plans to Buy Out Three CEPFs Without Issuing Equity**

In January 2022, the federal funds effective rate, a standard benchmark, was 0.08%, the lowest rate in a decade. Ex. F. But over the next 16 months, interest rates skyrocketed due to unprecedented inflation arising from the COVID-19 pandemic and related stimulus. By May 2023, the federal funds effective rate was 5.06%, over ***6200%*** higher than in January 2022. *Id.* As XPLR had warned, the rising interest rates resulted in XPLR's common unit price decreasing and cost of capital rising. *Id.*

At that point, the flip dates for six of XPLR's seven CEPFs remained in the future. As XPLR disclosed, three CEPFs needed to be bought out by the end of 2025 to prevent the distributions from flipping to CEPF investors. On May 8, 2023, XPLR announced plans to sell gas pipeline assets and use the proceeds for those three CEPF buyouts. Exs. H at 7, I at 2. It also announced that NEE was suspending collection of IDR fees from XPLR through 2026 to allow XPLR to "replace CAFD [cash available for distribution] from the planned sale of the natural gas pipelines" through 2026. Exs. H at 8, I at 2.

As part of the same May 8, 2023 update, XPLR disclosed that it "continues to see 12% to 15% growth per year in limited partner distributions per unit as being a ***reasonable range of expectations*** through at least 2026," but that "[g]iven the current capital markets environment, the partnership expects to grow distributions at or near the bottom end of this range." Ex. I at 2. XPLR's then-CEO John Ketchum explained that "[u]nder our plan, we currently do not expect any equity to be required to finance our growth plan through 2024 and do not expect any equity issuances to finance [CEPF] buyouts through 2025." *Id.* at 1. XPLR also warned that it needed "access to capital at reasonable cost and terms . . . to make cash distributions to its unitholders," and that there was no guarantee of such access. *Id.* XPLR's announcements also informed investors that its "cash available for distributions (CAFD) and unit distribution expectations" were "inherently uncertain" and "subject to" many specified "risks and uncertainties." *Id.* at 3.

Investors were also aware that XPLR would still need to fund $3.7 billion in CEPF buyouts that would come due between 2027 and 2034. *See* Exs. B at 38, G; ¶ 134.

**IV.    September 27, 2023:  XPLR Cuts Its Target Annual Distribution Growth Rate**

Through 2023, interest rates continued rising.  By September 2023, the federal funds effective rate was 5.33%—a 108% increase in 12 months and a more than *6500%* increase over 20 months.  Ex. F.  Consistent with XPLR's disclosures, its unit price declined, and its cost of capital, including interest expenses, rose.  Ex. F.  On September 27, 2023, XPLR revised its "limited partner distribution per unit growth expectations to 5% to 8% per year through at least 2026, with a target of 6% growth."  Ex. J at 1.  In a press release, Ketchum explained that "[t]ighter monetary policy and higher interest rates obviously affect the financing needed to grow distributions at 12%, and the burden of financing this growth has had an impact on [XPLR's] unit price and yield."  *Id.*  He told investors that "[i]n the current market environment, the partnership believes revising its growth expectations for now is the appropriate decision for unitholders and better positions it to continue to deliver long-term value."  *Id*.  The release explained that by "reducing its growth rate" and "executing on its previously announced transition plans" to buy out three CEPFs by the end of 2025, XPLR did "not expect to require growth equity to meet its revised growth expectations until 2027."  *Id*.  These disclosures included the same caveats regarding XPLR's ability to maintain its distributions as the May 2023 disclosures.

**V.    January 2024 – October 2024:  XPLR Discloses Its Evaluation of the CEPF Obligations and Enhances Its Risk Disclosures**

Heading into 2024, interest rates remained high and XPLR's unit price continued to decline.  Ex. F.  While its actions to date had secured funds for XPLR to buy out three CEPFs through 2025, XPLR still needed to address the disclosed $294 million in CEPF buyouts due in 2026, Exs. H at 7, I at 2, and $3.7 billion in CEPF buyouts due from 2027 to 2034, ¶ 134.

Ketchum announced on XPLR's January 25, 2024 earnings call that XPLR was "focused on the partnership's cost of capital improving, which is critical for its future success," and was "evaluating alternatives to address the remaining [CEPFs] with equity buyout obligations in 2027 and beyond."  Ex. K at 7.  An analyst asked when XPLR

planned to provide an update on alternatives for buying out CEPFs. XPLR then-CFO Terrell Crews responded that XPLR was "***looking at all options right now***," "with the goal of really maximizing unitholder value," but did not have an update on timing. *Id* at 11.

A few weeks later, on February 21, 2024, XPLR released its 2023 Form 10-K. Acknowledging persistent adverse market conditions, the 10-K amplified XPLR's prior warnings to include that "***sustained*** high interest rates," as opposed to "rising" rates, could adversely impact the price of XPLR's common units and ability to make distributions. Ex. B at 22. The Form 10-K also warned that, because of the CEPF obligations, "[XPLR] may not be able to pay distributions to its unitholders." Ex. B at 10, 17, 23. XPLR cautioned that "an existing common unitholder's proportionate ownership interest in [XPLR] may decrease" and "the amount of cash distributions per common unit may decrease" because of XPLR's need to buy out CEPFs, and XPLR "may reserve cash that otherwise would be available for distribution to unitholders for any such [CEPF] buyout or other business purposes in its discretion." *Id*. at 17, 23. Finally, XPLR added that, in addition to rising interest rates and other factors, "declining investor sentiment in NEP and the renewable energy industry" "has increased and could continue to adversely impact NEP's cost of capital," which "could cause significant common unitholder dilution and reduce the cash distribution per common unit." *Id*. at 16. A Barclays analyst promptly opined that "***a 45%–75% distribution cut*** may be necessary to pay down the upcoming CEPFs," reflecting the challenges conveyed in XPLR's disclosures. Ex. L at 1.

For the remainder of 2024, XPLR continued to provide updates on its review of alternatives for addressing CEPFs and never ruled out a distribution cut. On its April 23, 2024 earnings call, Crews stated that "we continue to evaluate alternatives to address the remaining convertible equity portfolio financing with equity buyout obligations in 2027 and beyond." Ex. M at 8. On that call, an analyst recognized the difficult situation XPLR faced with respect to buying out CEPFs "given the continued pressure from capital markets and . . . the benchmark rates," and Ketchum responded that "discussions continue to evolve" on this complex topic. *Id*. at 12. Similarly, on a July 24, 2024 earnings call, XPLR

then-CFO Brian Bolster again linked maintenance of the distribution with successful resolution of the CEPF buyouts, stating that "the partnership's 6% distribution growth target remains *for now*," but that XPLR "is *continuing to look at all options* . . . to address the remaining [CEPF] buyouts." Ex. N at 8. An analyst asked about the statement that the distribution growth target remains "for now," which he understood as "somewhat new language." *Id.* at 10. Ketchum responded "*we are obviously exploring all alternatives*." *Id.* at 11.

## VI. October 23, 2024: XPLR Withdraws Its Distribution Projection

On October 23, 2024, with interest rates still hovering around 5%, XPLR issued its quarterly earnings release. It announced that it "[p]lans to complete [its] convertible equity portfolio financing and cost of capital review by January 2025." Exs. O at 1, F. The release did not reaffirm the previous 6% distribution growth expectations, indicating instead that XPLR intended to provide its distribution expectations once it completed its review. *Compare* Ex. P at 16, *with* Ex. Q at 18. On XPLR's same-day earnings call, Ketchum had the following Q&A with an analyst:

- **Q** . . . Is there kind of a range of preferred outcomes that you can at least highlight to investors, *especially as you've kind of removed the language around the distribution growth targets*? I guess what should we read into that? I mean, obviously, the market is a little bit jittery around that language change. . . .
- **A** . . . So as we have said to investors over the last several months, we're completing our review regarding how to address . . . [the CEPF buyouts and] [XPLR's] cost of capital. We've been exploring a number of options as part of that. And as we said today, *we're also really reflecting on the yieldco model itself and contemplating the strategic shift in how we allocate capital*. One of the things that we are evaluating is *should we deploy more of our capital towards really growing the underlying cash flow of the business and maybe less towards distributions*. Ex. R at 12.

The market interpreted this announcement as XPLR foreshadowing a distribution cut. One article identified consensus expectations of *a 34% distribution cut*. ¶ 240. The announcement also suggested that XPLR *could entirely halt* its distributions and transition away from the yieldco model, as analyst reports confirm. For example, J.P. Morgan wrote

that "[w]e now model a ***complete dividend cut*** beginning in 1Q25, effectively transitioning the company from a YieldCo model to a GrowthCo model."  Ex. S at 3.

**VII.    January 28, 2025:  XPLR Suspends Distributions, Shifts to Growth Model**

On January 28, 2025, XPLR announced the conclusion of its financing review and disclosed that it was (1) "[m]oving from an acquisition and distribution model to a business that invests its retained cash flows in its existing assets and other attractive investments," (2) "[s]uspending its distribution to common unitholders for an indefinite period," and (3) using that "excess cash flow to buy out selected [CEPFs]."  Ex. T at 1.  Specifically, XPLR disclosed that, of the five then-outstanding CEPFs, it "intends to buy out three of these portfolios by the end of 2027" and the remainder through 2034.  *Id.*  With this plan, XPLR disclosed that it "believes it has a path to address all of the convertible equity portfolio financings which does not require additional equity issuances."  XPLR "believe[d]" that this plan would avoid diluting unitholders and provide the "best and most immediate value-enhancing opportunities for unitholders."  *Id*.

## LEGAL STANDARD

To state a Section 10(b) claim, Plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Zucco Partners* v. *Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir.), *as amended* (Feb. 10, 2009).  Under Rule 9(b), Plaintiff must "plead facts sufficient to plausibly articulate 'with particularity the circumstances constituting fraud.'"  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (quoting Fed. R. Civ. P. 9(b)).  On top of Rule 9(b), Congress imposed "a heightened pleading standard" under the PSLRA, which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).    Conclusory allegations and unwarranted inferences are "insufficient."  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993).

# ARGUMENT

## I.      None of the Alleged Misstatements Is Materially False or Misleading

To curb abuses of Section 10(b), the PSLRA "prescribes an exacting standard, under which a litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, is insufficient." *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (cleaned up). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson* v. *Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "For a statement to be false or misleading, it must directly contradict what the defendant knew at that time or omit[] material information." *Weston Fam. P'ship* v. *Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).

Plaintiff challenges 16 statements on six dates between May 8, 2023, and October 23, 2024. The majority are instances where XPLR and the Individual Defendants merely recited XPLR's distribution "target." ¶¶ 199, 202, 204, 212, 214, 216, 218, 220, 224, 226 (the "Distribution Target Statements"). The remainder are statements where Defendants discussed business "plans" or "expectations" surrounding XPLR's distributions, equity issuances, CEPF buyouts, and acquisitions, including cost of capital challenges, ¶¶ 202, 206, 208, 210, 222, 228 (the "Business Plan Statements"), or reminded investors that XPLR was evaluating all alternatives for addressing CEPFs, including shifting away from a yieldco model (the "October 2024 Statement"), ¶ 230. Plaintiff does not plead, however, that any of these three categories of challenged statements is false.

### A.      Plaintiff Fails to Allege Any Facts Supporting the FAC's Assertion That Defendants Decided to Suspend Distributions by "May 2023"

Plaintiff relies throughout the FAC on his bald allegation that "Defendants had determined, no later than May 2023, that cash distributions to investors would be eliminated." ¶¶ 58, 198. That is, he claims that all of the alleged statements about XPLR's distribution growth targets or plans to address CEPFs and maintain distributions were false because Defendants had allegedly already decided to eliminate distributions. ¶¶ 200–31.

However, Plaintiff does not allege any facts—much less particularized facts—supporting his conclusory allegation that Defendants had decided to eliminate cash distributions by May 2023—or at *any time* prior to the January 2025 announcement. This assertion—repeated throughout the FAC—underlies Plaintiff's entire theory. But no facts in the FAC support the implausible conclusion that Defendants had decided to cut distributions by May 2023, and that Defendants' measured and gradual efforts over the next 18 months to find the best path forward for unitholders were a pre-scripted sham. Plaintiff thus does not, as he must, allege that any of the challenged statements were false "at the time they were made." *Cloudera*, 121 F.4th at 1188. For example, Plaintiff does not allege that Defendants were *not* targeting a distribution growth rate of 12% to 15% in May 2023 or 6% from September 2023 to July 2024 (Distribution Target Statements), or that Defendants did *not* have plans to address CEPFs and maintain distributions by, for example, "the sale of the natural gas pipelines" as of May 2023 (Business Plan Statements). Indeed, the FAC does not contain a *single non-conclusory allegation* that XPLR or any other Defendant was planning to do something contrary to any statement when it was made.

If the Court ignores, as it must, the bald assertion that XPLR was planning to scrap distributions by May 2023, then the FAC must be dismissed. The Court need go no further.

**B.   The Alleged Misstatements Did Not Convey That Distribution Growth or the Yieldco Model Was "Secure" Through 2026**

Even if the FAC could be read to allege more than its defective theory that Defendants decided to cut distributions by May 2023 but told the public otherwise (it does not), there can be no claim that the alleged misstatements were false or misleading. To the extent Plaintiff asserts that the alleged misstatements were misleading because the statements somehow "promised distribution growth" or conveyed that the distribution was "secure" through 2026 and that distribution cuts would not occur, he grossly mischaracterizes them. *E.g.*, ¶¶ 24, 225. The Distribution Target Statements plainly stated that XPLR's distribution growth rate was a "target" (¶¶ 204, 212, 214, 216, 218, 220, 224, 226) within a "reasonable range of expectations" (¶¶ 199, 214, 220), and/or subject to

various risks (*e.g.*, ¶ 202; Exs. I, J, B, A, N). The Business Plan Statements expressed XPLR's ***plans and expectations*** regarding its ability to maintain distributions and address CEPF obligations, but did not promise a specific outcome. For example, XPLR disclosed that it "***believes*** revising its growth expectations ***for now*** is the appropriate decision" (¶ 202), "***does not expect*** to require growth equity to meet its revised growth expectations until 2027" (¶ 206), was "***charting a course*** to a sustainable future" via "execution of its ***plans***" (¶ 210), and had "talked about private capital raise ***potentially*** being a solution to address" CEPFs (¶ 222). Such statements did not promise a future outcome, as Plaintiff claims. Indeed, courts have long recognized that statements concerning "targets" and "expectations" for distributions to investors, or "plans" to maintain them, are not guarantees that distributions are "secure." *See, e.g.*, *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("statements regarding the future payment of dividends were predictions or opinions, and not guarantees"); *Maeve Inv. Co.* v. *Teekay Corp.*, 2017 WL 5158059, at *3 (WD. Wash. Nov. 7, 2017) (statements that defendant was "'targeting' future dividend growth" represented "nothing about a promise or guarantee"). And, contrary to Plaintiff's premise, the October 2024 Statement made clear that XPLR was exploring the option of pivoting away from a yieldco model entirely—not committing to that model. ¶¶ 230–31.

Likewise, Plaintiff ignores the contemporaneous public disclosures that made clear that distributions were not "secure" through 2026. XPLR repeatedly warned about the risk of a distribution cut, and XPLR's CEPF obligations were public knowledge. In fact, Plaintiff does not allege a single fact that XPLR concealed. The alleged misstatements could not be misleading against this background of cautionary disclosures.[4]

- As early as its first public filing in June 2014, XPLR disclosed that its distribution rate was based on "estimates and assumptions" and that "we may not be able to grow our business at a rate consistent with our expectations." Ex. A at 12.

---

[4] *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (statements not materially misleading when allegedly concealed information already known to market).

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                                 14

- XPLR supplemented this warning over the years.  For example, XPLR repeatedly warned that if it could not "access sources of capital on commercially reasonable terms," its distribution rate could be adversely impacted.  Ex. D at 18.

- XPLR warned that "a rising interest rate environment could adversely impact the price of [XPLR's] common units" and its ability to make distributions.  *Id*. at 24.  When interest rates remained high in 2023 and 2024, XPLR supplemented that risk factor to warn about "*sustained* high interest rates."  Ex. B at 22.

- XPLR transparently told investors in real time that its cost of capital "has increased," which "could cause significant common unitholder dilution and reduce the cash distribution per common unit."  *Id*. at 16.

- XPLR warned that dropdowns from NEE could cease, disclosing that "[s]uch acquisitions may not be available to [XPLR] on acceptable terms."  *Id.* at 14; *see id.* at 16 (similar).  Its public filings disclosed the decrease in XPLR's acquisitions during the Class Period.  *Id.* at 36 (year-over-year comparison of investment amounts).

- At all times, unitholders were fully aware that XPLR's Board had sole discretion to determine the distribution rate based on its evaluation of the "proper conduct of the business."  Ex. E at 9–10.

When the Class Period began in May 2023, the market also knew that XPLR (1) had issued seven CEPFs, (2) planned to make over $1.5 billion in CEPF buyouts from 2023–25, and (3) owed ~$3.7 billion on its remaining CEPFs from 2027–34, but had not announced plans for those buyouts.  ¶ 134; Exs. H at 7, I at 2, B at 38.  In other words, the market knew that XPLR had yet to address substantial CEPF liabilities.  Additionally, investors knew that, as interest rates soared, XPLR's unit price fell and borrowing costs rose, making CEPF buyouts through new equity issuances more difficult.  ¶¶ 88–89; Ex. F.  And investors knew that, without cutting distributions, XPLR had limited cash and assets available to fund CEPF buyouts.  ¶¶ 137–47.

Defendants had an open dialogue with investors throughout the Class Period about

XPLR's plans to address CEPFs and made clear that such plans potentially included cutting distributions.  In October 2023, it warned that CEPFs were coming due at the same time rates were rising, making it harder to support distributions.  Ex. U at 6.  In January 2024, XPLR announced that it was "evaluating alternatives to address the remaining [CEPFs]" and that "all options" were on the table.  Ex. K at 7, 11.  In February 2024, XPLR warned that CEPFs could mean XPLR "may not be able to pay distributions to its unitholders" and that it "may reserve cash that otherwise would be available for distribution to unitholders for any such [CEPF] buyout or other business purposes in its discretion."  Ex. B at 10, 17.  In July 2024, Defendants said that the distribution target remained "for now," but XPLR was "continuing to look at all options" to address CEPFs.  Ex. N at 8.  Finally, in October 2024, XPLR *withdrew* its distribution target and announced that it would provide an update in January 2025.  *Supra*  pp. 10–11.

XPLR thus provided real-time market updates about its plans to address CEPFs, including an express warning that XPLR might not continue to pay distributions.  The market understood these warnings:  after the October 2024 announcement, the market *predicted* a distribution cut, including an analyst who predicted "a complete dividend cut beginning in 1Q25, effectively transitioning the company from a YieldCo model to a GrowthCo model."  Ex. S at 3; *see supra* pp. 10–11.

**C.     All Alleged Misstatements Are Inactionable Opinion Statements**

Beyond these pleading defects, the challenged statements are statements of opinion, which are separately inactionable.  *See Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 182–85 (2015).  "[S]tatements regarding the future payment of dividends [are] predictions or opinions."  *IBM*, 163 F.3d at 107.  Such statements are actionable only if (1) "the speaker did not hold the belief she professed and the belief is objectively untrue"; (2) "a statement of fact contained within an opinion statement is materially misleading"; or (3) there are "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 615–

16 (9th Cir. 2017).  Not only does Plaintiff ignore that the statements are inactionable opinions, he pleads no facts to suggest he meets any of these three narrow exceptions.

As to the first exception, Plaintiff pleads no non-conclusory allegations that any of the speakers disbelieved the expressed "targets," "plans," or "expectations."  The FAC mentions no contemporaneous discussions, emails, or other documents supporting its pure conjecture that Defendants decided to halt distributions by no later than May 2023, and includes no other allegations of disbelief by the speakers at all.  *Supra* pp. 12–13; *infra* pp. 21–22.  "Plaintiffs' claims are conclusory, relying in part on a claim the speakers must have known that their expectations were unachievable at the time they were made; but, without any facts to support such a statement, this proves insufficient."  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 317 (S.D.N.Y. 2020).

Similarly, the second exception is not met because Plaintiff has not alleged that any of the alleged misstatements contain any statement of present fact that was false when made.  The statements do not contain present facts.  Rather, they are statements about the future, using terms such as "target," "plan," and "expect."  *See, e.g.*, *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) ("expectations," "target[s]," and "prediction[s]" are opinions), *aff'd*, 816 F.3d 199 (2d Cir. 2016).  These statements do not include any concrete present facts as to financing or guaranteed distribution capacity.

For the same reasons, the third exception is not met either.  Unless one credits the FAC's bald assertion that XPLR had decided by May 2023 to cut the distribution (which the Court cannot), none of the statements omits facts that render it misleading.  To the contrary, Plaintiff relies on facts—such as growing debt, interest rate challenges, declining assets, resistance to dilution, negative income, and a pause in dropdowns—that ***XPLR disclosed in real time***.  ¶¶ 35–44, 228.  Plaintiff cannot plead that Defendants' "omissions" made any of their statements misleading by relying on the very disclosures that Defendants made in real time.  *See, e.g.*, ¶¶ 34, 44, 132, 137, 142, 150.

**D.  All Alleged Misstatements Are Protected Forward-Looking Statements**

The challenged statements are also forward-looking statements subject to the

---

PSLRA safe harbor and the "analogous" common-law "bespeaks caution" doctrine, which the PSLRA codified. *Cutera*, 610 F.3d at 1111; *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund* v. *Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 866, 876, 883 (N.D. Cal. 2004).[5] A forward-looking statement is "a statement containing a projection of revenues," "a statement of future economic performance," or "any statement of the assumptions underlying or relating to" these kinds of statements. 15 U.S.C. § 78u-5(i)(1)(A), (C)-(D); *see also, e.g.*, *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996) ("forecasts about future profits" were "inactionable"); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080 (C.D. Cal. 2003) (bespeaks caution doctrine applies to "revenue projections"). Such statements include "a projection of . . . dividends" and any statement relating to such a projection. 15 U.S.C. § 78u-5(i)(1)(A), (D); *In re Secure Comput. Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (bespeaks caution doctrine applies to "future projections, estimates and forecasts" related to "dividends, capital structure or other financial items"). The challenged statements concern projected distributions and future financial performance, including growth "targets," and are paradigmatic examples of forward-looking statements.

Statements are immune from liability if *either* (i) they were "identified as . . . forward-looking" and "accompanied by meaningful cautionary statements," *or* (ii) plaintiff fails to plead particularized facts showing that the speaker had "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(A)(i), (B)(i); *see Clorox*, 353 F.3d at 1132. Meeting *either* prong would shield Defendants from liability, and here *both* prongs are satisfied:

*First*, the statements were identified as forward-looking and accompanied by meaningful cautionary language. *See, e.g.*, Exs. I at 3–5, J at 3–6, K at 4, M at 4, N at 4, R

---

[5] XPLR is a "limited partnership," which the PSLRA distinguishes from a general "partnership." *See, e.g.*, 15 U.S.C. § 78n(d)(2) (imposing obligation on "partnerships" and "limited partnerships"). Courts routinely apply the safe harbor to limited partnerships. *Dynagas*, 504 F. Supp. 3d at 319; *In re Ferrellgas Partners, Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). It is ultimately immaterial whether the PSLRA safe harbor applies because the safe harbor codifies the bespeaks caution doctrine, which unquestionably applies to partnerships like XPLR.

at 4. Cautionary language is "meaningful" if it "identif[ies] important factors that could cause actual results to differ materially from those in the forward looking statement." *Cutera*, 610 F.3d at 1111. During the relevant earnings calls and press releases, Defendants explicitly referenced the cautionary language in XPLR's SEC filings. *Id*.; *see Institutional Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 257–58 (3d Cir. 2009) (projection was protected where transcript pointed to cautionary statements in SEC filings); *Dynagas*, 504 F. Supp. 3d at 319 (same).

Those SEC filings contained detailed cautionary language. XPLR's 10-Ks disclosed that XPLR's growth depended on acquiring projects, "a capital intensive business" that "relies heavily on the availability of debt and equity financing sources." Consequently, "[a]ny . . . significant increase in interest rates could make it difficult . . . to raise funds when needed to secure capital financing." Ex. D at 17; *see also* Ex. B at 15; *see also supra* pp. 14–15. XPLR further warned that among the most "important consequences" of its debt service obligations was that they "require[d] [XPLR] to dedicate a substantial portion of [its] cash flow to pay principal and interest on [its] debt, thereby reducing . . . [its] cash available for distribution." Ex. B at 18. These disclosures directly addressed the risks Plaintiff claims materialized.

**Second**, as discussed, beyond the bald and unsupported allegation that XPLR decided to cut distributions by May 2023 (which cannot be credited), Plaintiff fails to allege any facts that Defendants had "actual knowledge" that their expectations and projections were false. Plaintiff must allege facts creating "a strong inference" that Defendants made the forecasts with "actual knowledge" that the statements were false or misleading. *Clorox*, 353 F.3d at 1134. The FAC points to no sources that contradict the alleged misstatements or create a strong inference that Defendants disbelieved them. *Supra* pp. 12–14; *infra* pp. 21–22.

The statements are thus protected by both the PSLRA safe harbor and the bespeaks caution doctrine.

## II.     The Complaint Fails to Plead a Strong Inference of Scienter

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                                                  19

## A.  Plaintiff Fails to Meet the PSLRA's Demanding Pleading Standard

The PSLRA requires Plaintiff to plead with particularity facts giving rise to a "strong inference" of scienter—"intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.  A "strong" inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.  The scienter inquiry is "inherently comparative" and requires courts to "take into account plausible opposing inferences." *Zucco*, 552 F.3d at 991.

Because all of the statements at issue are forward looking, Plaintiff must plead, with respect to each Individual Defendant and statement, that the statements were made "with **actual knowledge** by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i).  For the corporate Defendants, Plaintiff must plead that each statement was "made by or with the approval of an executive officer of that entity . . . with **actual knowledge** by that officer that the statement was false or misleading." *Id.* § 78u-5(c)(1)(B)(ii).  Plaintiff must plead particular facts—such as "documentation, communication, or conversation"—showing that Defendants knew contrary information. *Mizzaro* v. *Home Depot, Inc.*, 544 F.3d 1230, 1250–51 (11th Cir. 2008).  "[G]eneralized assertions of motive based on potential profit . . . are also insufficient." *Mallen* v. *Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1137 (S.D. Cal. 2012).  "And because a corporation can only act through its employees and agents, it can only have scienter through them." *Prodanova* v. *H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021).

The FAC fails to surmount the PSLRA's high hurdle.  Plaintiff alleges no specific facts showing that Defendants disbelieved their alleged misstatements at the time they were made, and instead relies on rank speculation and bare accusations about Defendants' motive.  But Plaintiff's bald allegation that Defendants decided to cut distributions by May 2023 comes nowhere close to meeting the stringent standards for pleading scienter.  Indeed, notably missing from the FAC is **any** document, email, statement, or witness account pointing to any Defendant's state of mind.  Devoid of such, the FAC must be dismissed on yet this additional independent ground. *See Dynagas*, 504 F. Supp. 3d at 317.

## B.    Plaintiff Engages in Improper Group Pleading

The FAC alleges sixteen purported misstatements across six dates.  But the FAC fails to attribute any allegations of scienter to a specific Defendant.  Rather, the scienter allegations are blanket statements about "Defendants" as a group.  For example, Plaintiff asserts that "***Defendants*** already knew that they would be unable to maintain the distribution growth rate" and "***Defendants*** were hiding the inevitability of distribution termination." ¶¶ 216–17.  Such group pleading alone is fatal to the FAC.  Nor does Plaintiff allege scienter as to each specific alleged misstatement.  To overcome the high hurdle of the PSLRA, the "Court must [] analyze scienter separately ***for each alleged misrepresentation and each defendant***." *In re Wet Seal, Inc. Sec. Litig*., 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007).  "[W]ithout particularized allegations that [a defendant] was involved with the [misstatement] and ignored its falsity, there is not enough factual support for a plausible inference of scienter." *Prodanova*, 993 F.3d at 1110.

## C.    The Complaint Contains No Specific Allegations That Any Defendant Believed or Intended His Statements to Be False

"[T]he complaint must contain allegations of specific contemporaneous statements or conditions" to establish that a statement was knowingly false when made. *Ronconi* v. *Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  The FAC omits any allegation of specific contemporaneous statements or conditions, or evidence from any witness as to the mental state of any Defendant.  The core surmise repeated throughout the FAC that "Defendants had determined, no later than May 2023, that cash distributions to investors would be eliminated," ¶ 58, is supported by no statement, fact, document, or other evidence.  And although Plaintiff proffers variations on this theme, i.e., Defendants "were preparing to terminate distributions," "hiding this inevitability," "already knew that they were unable to maintain" the forecasted distribution rate, "were preparing for the elimination of the yieldco model," and "knew distributions could not be maintained while conducting CEPF buyouts," ¶¶ 34, 200, 201, 203, 205, 207, 209, 211, 215, 219, 221, 223, 225, 227, 229, 231, these are all likewise bare allegations that are insufficient to plead scienter.  *See, e.g., In re*

*Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). The same goes for empty allegations that "Defendants knew that they were making misrepresentations and omissions, as they knew that distributions and the yieldco model must be eliminated." ¶ 265. With only conclusory allegations, the FAC must be dismissed.

In fact, courts routinely dismiss complaints that "fail[] to allege sufficient facts to show that [the speaker] did not believe the complained of statements or knew them to be false." *Walker* v. *L Brands, Inc.*, 2020 WL 6118467, at *13 (S.D. Ohio Oct. 16, 2020) (dismissing claim about dividend levels). In *Dynagas*, defendants made statements about their ability to maintain a dividend. 504 F. Supp. 3d at 314–15. The court dismissed the complaint, holding that a claim that the speakers "must have known" their expectations were unachievable is alone insufficient to plead scienter. *Id*. at 316. The same result should apply here. *See also Prodanova*, 993 F.3d at 1108 (plaintiff did "not allege[] with particularity—or even allege[] at all—that [the defendant] acted with scienter" where complaint pleaded "no facts alleging" contemporaneous knowledge); *In re Dot Hill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *1, *5 (S.D. Cal. Sept. 2, 2008) (Sammartino, J.) (plaintiff did not plead scienter where he alleged that defendants were aware of factors underlying inaccuracies in financial statements but did not know the statements to be false).

### D.    The Complaint Alleges No Cognizable Motive to Defraud

The conclusory FAC is particularly defective because it fails to plead motive. Courts "expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior." *Prodanova*, 993 F.3d at 1107. "[T]he lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Id.* at 1108. "Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent . . . will [courts] overlook the failure to allege a plausible motive." *Id.* Because the FAC lacks any compelling and particularized facts showing fraudulent intent, its failure to allege a plausible motive is fatal.

***First***, no theory of motive to defraud is plausible, given that the Individual

MOTION TO DISMISS

Defendants and NEE *increased* their holdings of XPLR units during the Class Period. Both "a lack of stock sales" and acquiring "additional stock during the Class Period" "detract from a scienter finding." *Webb* v. *Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) ("where a defendant sold no stock at all, . . . there was not a strong inference of scienter"). NEE held over 1.75 million more XPLR units after the Class Period than before the Class Period. *Compare* Ex. D at 4, *with* Ex. V at 6. As Plaintiff points out, "NEE was a unitholder in XPLR, *meaning that it itself benefited from unitholder distributions*." ¶ 19. And each Individual Defendant received XPLR units during the Class Period but did not sell any units (small amounts were withheld as tax). *See* Exs. W, X, Y. Any theory that Defendants knowingly concealed their decision to cut distributions to keep XPLR's unit price afloat during the Class Period is inconsistent with their *increasing* their own holdings in XPLR at supposedly artificially inflated prices during that same period.

*Second*, Plaintiff's allegations of routine financing objectives fail to plead motive. Plaintiff alleges that NEE needed to "maintain the illusion that XPLR remained healthy" because "NEE was seeking to obtain financing for its projects," and if its funders knew of XPLR's true state, that would have put NEE "at risk of getting less favorable terms . . . , or no financing at all." ¶¶ 45–50, 151–97. Plaintiff speculates that NEE waited to cut the distribution until after it raised $4.4 billion through three deals in 2024. ¶¶ 57, 61.

This allegation is unsupported by any well-pleaded facts. A defendant's "motive to . . . obtain good financing" is a "routine corporate objective[]" and thus "not 'specific' or 'particularized'" as is required to plead scienter. *Webb*, 884 F.3d at 856. Regardless, the amount of financing NEE raised in 2024 was consistent with NEE's annual financing—including in 2025 *after* the "truth" about XPLR was purportedly revealed. *Compare* ¶ 185 (alleging $4.4 billion in capital raises in 2024), *with* Ex. Z (total of approximately $9 billion in capital raises in 2023), *and* Ex. AA (total of approximately $14.8 billion in capital raises in 2025).

*Third*, Plaintiff's theory that NEE suspended its collection of IDR fees through 2026

to "keep XPLR's failing yieldco structure a secret," ¶ 267, is both factually unsupported and nonsensical. NEE eliminated IDR fees (over $100 million annually) to its own detriment in order to assist XPLR. While Plaintiff frames this decision as an effort to instill false confidence in XPLR investors, XPLR publicly announced that NEE was suspending IDR fees to provide XPLR with more cash flow to fund distributions—that is, it disclosed that the reason for forgoing IDR fees was to address XPLR's financing challenges. ¶ 50; Ex. I at 2. The public acknowledgement that NEE was taking steps to alleviate XPLR's challenges *undercuts* an intent to deceive. *See In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1160 (S.D. Cal. 2008) (Sammartino, J.). NEE's economic assistance to XPLR, provided explicitly to help it navigate a challenging market, is the opposite of falsely painting a rosy picture. And, once again, the FAC includes no contrary factual allegations.

*Fourth,* Plaintiff's conjecture about XPLR's executive equity compensation is likewise illogical. Plaintiff theorizes that the Individual Defendants on XPLR's Board must have known that XPLR's model was not sustainable in March 2024 because, at that time, they increased the EBITDA target at which equity awards would vest from $400 million to $900 million. In other words, the Individual Defendants supposedly made it more challenging for their own equity awards to vest "to protect NEE from having to pay out incentive compensation on the lower $400 million [target]," as NEE could "retain cash if the higher $900 million [target] was not met." ¶¶ 100, 101, 182, 184. Again, there are *zero well-pleaded facts* to support this theory. And this speculation does not support scienter; it *cuts against* scienter: if the Individual Defendants increased the target for their equity awards to vest, that would harm, not benefit, them. *See Prodanova*, 993 F.3d at 1107 (scienter implausible when defendant would stand to lose from alleged fraudulent activity). In any event, Plaintiff's theory also assumes that the new $900M target was not achievable (and would thus preserve cash), but the new threshold was still far below XPLR's adjusted EBITDA at all times during the Class Period. That is why Plaintiff does not (and cannot) allege that XPLR did not meet this higher target (it did). *See* ¶ 154

(reporting EBITDA of $1 billion); Exs. K at 10 ($1.9 billion), T at 2 ($1.959 billion).

### E.   The Most Compelling Inference Is Not Fraud

The scienter inquiry is comparative, and here the most cogent inference is non-fraudulent. *See Tellabs*, 551 U.S. at 323. The more compelling inference from the FAC is that XPLR faced significant headwinds from the prolonged increase in its cost of capital, making the financing of the yieldco model—including acquisitions, distributions, and CEPF buyouts—more difficult. Over almost two years, XPLR considered and disclosed numerous alternative strategies to finance its business model, including asset sales, increasing yields on certain assets, a private capital raise, and reducing its distribution growth rate. ¶¶ 53, 148–49, 169, 222. XPLR repeatedly told the market it was reviewing its model for financing its business and expressly warned of potential distribution cuts. In October 2024, it withdrew its distribution target altogether, and, as some analysts predicted, in January 2025 it decided to cut distributions entirely. XPLR concluded that this approach, as part of its transition away from a yieldco model, would provide the most value to investors. ¶¶ 236–37. Defendants plainly believed in what they were saying, as evidenced by their ***increasing*** their holdings of XPLR units during the Class Period. *Supra* pp. 22–23. Plaintiff seeks a competing inference that Defendants knew all along this was their plan, but with no alleged facts to support that theory. "[F]raud by hindsight is not actionable." *Cai* v. *Eargo, Inc.*, 2025 WL 66041, at *1 (9th Cir. Jan. 10, 2025).

Indeed, Defendants' public warnings alone doom Plaintiff's fraud theory. Plaintiff points to 16 public disclosures in which XPLR slowly lowered distribution projections over nearly two years, and warned investors that rising interest rates and its CEPF obligations were requiring it to explore various alternatives, including distribution cuts and potentially changing its business model altogether. *See supra* pp. 14–16 (cataloging warnings to investors). As this Court has held, "[d]isclosing the precise risks at issue negates an inference of scienter." *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d at 1160 (cleaned up).

For these reasons, Plaintiff fails to plead a strong inference of scienter.

---

MOTION TO DISMISS
Case No. 3:25-cv-01755-JLS-DDL                                                                    25

### III.   The Complaint Fails to Plead Loss Causation with Respect to the Purported September 2023 Corrective Disclosure

Plaintiff has "the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that *after purchasing her shares and before selling*, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). Here, Plaintiff alleges that XPLR made the first of two corrective disclosures on September 27, 2023. ¶ 258. But Plaintiff first purchased XPLR shares on October 9, 2024—more than one year after the alleged September 2023 disclosure and market price decline. ECF No. 24-3, Ex. B. Plaintiff cannot plead loss causation as to the September 27, 2023 stock decline that pre-dated his purchase, *In re BofI*, 977 F.3d at 789, requiring partial dismissal of his claim.

### IV.   The Complaint Fails to Allege Any Statements by NEE

Yet another reason Plaintiff's Section 10(b) claim independently fails against NEE is because NEE was not the "maker" of any alleged misstatements. *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 134, 142 (1998). "[A] parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998). NEE is at most a part owner of XPLR, an entity that it does not control because of several factors, including the right of XPLR's public unitholders to elect a majority of XPLR's board. *See* ¶ 82. Only the "maker" of a false statement may be liable under Section 10(b), and a parent is not liable for a subsidiary's statements where the parent did not exercise "ultimate authority" over the statement. *Janus*, 564 U.S. at 142, 146–48. Plaintiff will surely point to allegations that some NEE personnel served on XPLR's Board (or as XPLR officers), but "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability

for its subsidiary's acts." *Bestfoods*, 524 U.S. at 69.  Corporate officers and directors can "change hats," and courts presume these individuals are wearing their "subsidiary hats," not their "parent hats," when acting for the subsidiary.  *Id.*  This applies even to **wholly owned** subsidiaries, and NEE owns—and only indirectly—barely a majority of XPLR.

Courts apply this principle stringently.  In *In re Optimal U.S. Litigation*, the court held that false statements in a prospectus by a dual director were not attributable to the parent when the director "explicitly assumed responsibility for the statements in his capacity as director of [the subsidiary]."  2011 WL 4098745, at *4, *6 (S.D.N.Y. Oct. 11, 2014).  Similarly, in *Oaktree Principal Fund* v. *Warburg Pincus*, the court held that allegations that a subsidiary made misleading statements to benefit its parent did not overcome the presumption that dual directors were speaking for the subsidiary.  2016 WL 6782768, at *11 (C.D. Cal. Aug. 9, 2016).  Even participation by parent personnel in the subsidiary's earnings calls was insufficient for parent liability.  *Id.*

Here, every alleged misstatement was made in publications by, or on earnings calls for, XPLR.  The statements were never attributed to NEE or any Individual Defendant acting on behalf of NEE.  Earnings calls distinguished discussions of XPLR from discussions of NEE, *see* Exs. K, M, N, R, U, and XPLR's SEC filings made clear that signatories were wearing their subsidiary hats, *e.g.*, Ex. D at 30.  *Bestfoods* thus dictates that the Individual Defendants were wearing their "subsidiary hats."

Statements by XPLR thus cannot be attributed to NEE absent facts showing that NEE actually had ultimate authority over the statements.  No such facts are alleged.  Although Plaintiff alleges that affiliate NEE Management had an MSA with XPLR, that is insufficient to attribute XPLR's statements to NEE.  The MSA did not give NEE control of XPLR; NEE Management only provided management services to XPLR and was never a final decisionmaker as to XPLR's disclosures.  *See* Ex. C §§ 3.1, 3.3, 3.4.2; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 205–08 (S.D.N.Y. 2022) (even when parent agreed to provide management services (including review of disclosures) to subsidiary, it did not qualify as "maker" of statements absent ultimate authority over them).

## V.     The Complaint Fails to State a Claim for Control Person Liability

Plaintiff's control person claims under Section 20(a) must be dismissed in their entirety because Plaintiff fails to allege a primary violation. *See, e.g.*, *Lipton* v. *Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

An additional reason exists to dismiss the control person claim against NEE—the FAC does not adequately plead that NEE is a control person. Plaintiff's allegations that NEE controls XPLR boil down to the conclusory statement that "[a]t all relevant times, NEE controlled XPLR and benefited from XPLR in numerous ways." ¶ 98. Reading the FAC most charitably, the FAC alleges a contractual management relationship between a NEE *subsidiary* (not NEE itself) and XPLR, ¶ 108, that NEE and XPLR shared officers, ¶ 99, that they had similar interests, ¶¶ 104, 105, and that they each held stakes in a shared subsidiary, ¶¶ 110, 111. These allegations are insufficient to plead a control person claim, as they do not show that NEE had "power to direct the management and policies of the primary violator," as opposed to mere "power to influence managerial decisions." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (collecting cases).

Lastly, the FAC pleads nothing about what percentage of XPLR units are held by NEE and shows, at most, that NEE officers comprised a *minority* of the XPLR Board—only three of seven seats. But "[m]inority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control" for Section 20(a) liability. *Id.*; *accord, e.g.*, *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994).[6]

### CONCLUSION

For the foregoing reasons, the motion to dismiss should be granted.

---

[6] The MSA does not change this conclusion because the MSA is between XPLR and NEE Management, a *subsidiary* of NEE—not NEE. And the MSA itself provides that "[t]he Manager . . . shall, at all times, be subject to the supervision of [XPLR's] Governing Body, . . . and any actions taken by the Manager . . . shall be consistent in all material respects with any guidelines, directions or instructions of, the board of directors of [XPLR]." Ex. C § 3.1.1. As Plaintiff acknowledges, the services performed by NEE's subsidiary were "provided to XPLR *under the direction of [XPLR's] board*." ¶ 69.

Dated:  March 17, 2026

Respectfully submitted,

**PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP**

By:    */s/ Jonathan S. Tam*
Jonathan S. Tam (CA 304143)
2029 Century Park East
Los Angeles, CA 90067
Telephone: 310-982-4346

Joshua Hill (CA 250842)
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: 628-432-5123

Daniel J. Kramer (*pro hac vice*)
New York Bar No. 1979392
Audra J. Soloway (*pro hac vice*)
New York Bar No. 4113536
David P. Friedman (*pro hac vice*)
New York Bar No. 5387774
Max H. Siegel (application for admission *pro
  hac vice* forthcoming)
New York Bar No. 5652235
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: 212-373-3000

*Counsel for Defendants*