Karolina Klyuchnikova (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
kklyuchnikova@scott-scott.com

*Counsel for Plaintiff James Alvrus*
*and the Proposed Class*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ALVRUS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> XPLR INFRASTRUCTURE, LP f/k/a NEXTERA ENERGY PARTNERS, LP, JOHN W. KETCHUM, BRIAN W. BOLSTER, TERRELL KIRK CREWS II, and NEXTERA ENERGY, INC., <br><br> Defendants. | Case No. 3:25-cv-01755-JLS-DDL <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

i

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    XPLR's Yieldco Business Model ................................................... 2

    B.    CEPF Obligations Made Continued Distributions Untenable .............. 3

    C.    Defendants' Concealment: Stopgaps Presented as Solutions .............. 4

    D.    The Truth Emerges and Losses Materialize ........................................ 5

LEGAL STANDARD .............................................................................................. 6

ARGUMENT ........................................................................................................... 6

I.     THE COMPLAINT PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS ........................................................................ 6

    A.    Defendants Concealed Material Adverse Facts Making Their Distribution Guidance Unreasonable When Made .............................. 7

    B.    Defendants Misled Investors by Touting Falsely Positive Statements Regarding XPLR's Financial Condition ......................... 11

    C.    XPLR's Risk Disclosures Were Not Adequate ................................. 16

    D.    Even if Opinions, Defendants' Statements Are Actionable Under *Omnicare* ................................................................................ 17

    E.    PSLRA Safe Harbor Does Not Immunize Defendants' Statements ......................................................................................... 18

II.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ................................................................................................... 19

    A.    Defendants' Actual Knowledge Establishes Scienter ....................... 20

    B.    The Core Operations Doctrine Supports Scienter ............................. 21

    C.    Defendant-Specific Attribution Defeats Group Pleading Problem .............................................................................................. 22

    D.    Defendants' Miscellaneous Counterarguments Fail ......................... 23

III.   THE COMPLAINT PLEADS LOSS CAUSATION ................................... 25

IV.   DEFENDANTS' TRUTH-ON-THE-MARKET DEFENSE IS PREMATURE AND FLAWED ................................................................... 25

V.    NEE CONTROLLED XPLR FOR PURPOSES OF THE §§10(B) AND 20(A) CLAIMS................................................................................... 27

i

A.    NEE Controlled XPLR for Purposes of the §§10(b) and 20(a) Claims ...........................................................................................27

B.    Plaintiff Alleges that NEE Violated §10(b).......................................28

CONCLUSION..........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..............................................................11, 16, 22, 23

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................11, 12

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) .....................................................26

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*,
738 F. Supp. 3d 1182 (N.D. Cal. 2024) ...............................................................25

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*,
166 F.4th 805 (9th Cir. 2026) .......................................................................22, 23

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .................................................................................6

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ...............................................................................11

*Ferry v. DF Growth REIT*,
2024 WL 5011949 (S.D. Cal. Dec. 6, 2024) ..................................................11, 28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .................................................................................7

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ........................................................................27, 28

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .......................................................................16, 17, 24

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...............................................................25

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) .............................................................................15

iii

*In re Atossa Genetics Inc Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ...................................................................................11

*In re Biomarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................19

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...............................................................................19

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020) ...............................................8, 10, 17, 19

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .............................................................................19, 26

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................28

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .................................................................................6

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .......................................................6, 25, 26

*In re Newbridge Networks Sec. Litig.*,
962 F. Supp. 166 (D.D.C. 1997) ............................................................................26

*In re Nuvelo, Inc. Sec. Litig.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................12

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ...........................................................................6, 18

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..................................................................................24

*Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*,
2025 WL 2426714 (C.D. Cal. Aug. 20, 2025) ......................................................24

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...................................................................................19

*Int'l Bus. Machs. Corp. Sec. Litig.*,
163 F.3d 102, 107 (2d Cir. 1998) ..........................................................................15

iv

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)........................................................................ 7, 18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................. 6

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015)........................................................................25

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014).................................................................17

*Nguyen v. Radient Pharms. Corp.*,
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ......................................................26

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003).................................................................18, 27, 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..........................................................................7, 17, 18

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
  690 F. Supp. 3d 862 (N.D. Ill. 2023)...................................................................18

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)...............................................................................21

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016)..................................................................12, 19, 20

*Scott v. ZST Digital Networks, Inc.*,
  2012 WL 538279 (C.D. Cal. Feb. 14, 2012)........................................................27

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..........................................................................6, 19, 21

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996).........................................................................12, 16

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018).................................................................................24

## STATUTES, RULES & REGULATIONS

15 U.S.C. §78u-5 ...................................................................................................... 18

17 C.F.R. §230.405 ...................................................................................................27

Fed. R. Civ. P. 15 ......................................................................................................28

**INTRODUCTION**

This case begins with a simple number: *$5 billion*.  That is roughly the amount Defendant XPLR Infrastructure, LP ("XPLR" or the "Company") needed just to meet its convertible equity portfolio debt obligations between 2025 and 2034. And XPLR needed even more to pay distributions to its investors, as the ability to pay such distributions is the key to attracting investors in "yieldcos" like XPLR. But XPLR lacked the money to do both. To make matters worse, by the start of the Class Period in May 2023, XPLR's poor performance and cash needs also threatened Defendant NextEra Energy, Inc. ("NEE"), the company that controlled XPLR. Specifically, during this period, NEE was trying to raise additional financing for itself. NEE could ill afford having bad news about XPLR's weak condition emerge lest it impair NEE's own efforts to raise billions of dollars—particularly since one of NEE's subsidiaries ("NEER") would have needed $20 billion in capital expenditure if XPLR imploded.

Accordingly, from May 2023 until NEE finished securing its own needed financing in late 2024, Defendants worked to maintain the illusion that XPLR was sufficiently strong to both meet its debt obligations *and* increase its distributions to investors. Defendants touted the present stable financial position of XPLR and promised continued distribution growth through at least 2026, NEE suspended its own fees to keep XPLR afloat in its yieldco form for the time being, and then XPLR used various one-time fixes (such as taking cash sweep money from NEER) to keep the illusion of stability going. NEE raised roughly $4.4 billion in new financing during the Class Period, with the last one closing on October 31, 2024. ¶¶185, 192-194.[1]

---

[1] Citations to "¶" are to paragraphs of the First Amended Class Action Complaint ("Complaint"). ECF No. 38. Unless otherwise stated, all emphases in quoted materials are added, and all internal quotation marks and citations are omitted.

1

25cv1755

Less than three months after NEE banked the last piece of its $4.4 billion capital raise, markets were shocked by the news that Defendants were effectively pulling the plug on XPLR's future as a yieldco, that XPLR would be *eliminating* future distributions to investors, and that it would in fact be fundamentally changing its business model. In response, the price of XPLR units plummeted by nearly 35%. ¶60.

In response, Defendants try to argue that on one hand they did not know until the end that XPLR's distributions would be eliminated, yet that the market somehow knew that this would happen. Such reasoning makes no sense. Nor does their reliance on a "forward-looking" statements defense hold water, as the thrust of their statements was that XPLR's present financial condition was sufficiently strong and its business model sufficiently on track to support continued growth in (let alone maintenance of) distributions to investors. Instead, the fact pattern here supports a strong inference that Defendants acted *deliberately* to keep the market in the dark as to XPLR's true condition and the sustainability of its business model so that NEE could secure its own $4.4 billion in needed financing. That Defendants thought they could somehow obtain $5 billion and at the same time keep growing distributions is unrealistic. The absurdity of this underlies all the misstatements that Defendants made to investors.

## STATEMENT OF FACTS

### A.   XPLR's Yieldco Business Model

XPLR is a "yieldco," a publicly traded limited partnership formed to acquire and hold operational clean energy assets, primarily wind, solar, and battery storage projects developed by its parent company and controlling entity, NEE. ¶¶3-6. A yieldco's defining purpose is distribution: investors buy units not for capital appreciation, but to receive predictable and growing cash distributions. ¶¶5, 15. XPLR publicly committed to this model throughout the Class Period, describing its "primary business objective" as delivering distributions to common unitholders that

2

25cv1755

it planned to "grow over time." ¶24.

NEE controlled XPLR through a Management Services Agreement ("MSA"), equity ownership, and an interlocking executive structure in which Ketchum, Bolster, and Crews ("Individual Defendants") each simultaneously held senior positions at NEE and XPLR. ¶¶6, 9, 69. The relationship was mutually beneficial: NEE used XPLR as a built-in buyer for completed energy projects, recycling capital for new development, while collecting management fees and incentive distribution rights fees ("IDR fees") from XPLR's operating subsidiary. ¶¶17-22. NEE also held borrowing access to XPLR's subsidiary, XPLR Infrastructure Operating Partners, LP ("OpCo"), through a Cash Sweep and Credit Support Agreement ("CSCS"), under which NEER (NEE's subsidiary), and therefore NEE, could draw funds and return them only "as needed." ¶124. XPLR and "an indirect wholly owned subsidiary of" NEE were parties to the MSA, "under which operational, management and administrative services are provided to XPLR under the direction of the board, including managing XPLR's day-to-day affairs and providing individuals to act as XPLR's executive officers." ¶69.

Because yieldcos distribute most of their cash to their unitholders, they cannot fund acquisitions internally and depend heavily on debt and equity issuances to finance growth. ¶16. To supplement this structure, XPLR entered into convertible equity portfolio financing agreements ("CEPFs")—structured financings backed by specific energy asset portfolios—raising approximately $5.7 billion through CEPF transactions from 2018 through 2023. ¶¶29-31.

**B.    CEPF Obligations Made Continued Distributions Untenable**

The CEPF financing structure embedded a time-limited obligation that would prove fatal to XPLR's model. Each CEPF required XPLR to either buy out the third-party CEPF investor at the end of a defined period, whether in cash or in XPLR units, or forfeit the underlying asset's cash distributions to that investor. ¶29. In the aggregate, the buyouts associated with XPLR's existing CEPF portfolio required

3

approximately $5 billion in liquidity between 2025 and 2034: approximately $1.3 billion due between 2025 and 2026, and approximately $3.675 billion due between 2027 and 2034. ¶¶133-35.

XPLR did not have the resources to satisfy these obligations. At year-end 2022, XPLR held only approximately $226 million in cash; by 2023, approximately $274 million; and by 2024, approximately $283 million. ¶37. Its operating income turned negative in 2023 at -$28 million and worsened to -$459 million in 2024. ¶42. Net income fell from $1.121 billion in 2022 to $218 million in 2023 and -$411 million in 2024. ¶43. Cash available for distribution stood at only $689 million in 2023. ¶40. And after paying distributions, XPLR had only $375 million in cash in 2023 and $296 million in 2024. ¶44.

Rising interest rates compounded the structural problem in two ways: debt financing for CEPF buyouts became prohibitively expensive, and declining XPLR unit prices raised the cost of any equity-based buyout solution. ¶33. By no later than May 2023 (the start of the Class Period), Defendants knew or should have known that XPLR could not both sustain, let alone grow, its distribution obligations and meet its looming CEPF buyout requirements. ¶34.

**C.    Defendants' Concealment: Stopgaps Presented as Solutions**

Rather than disclose these irreconcilable pressures, Defendants took a series of structural steps that publicly preserved the appearance of XPLR as a functioning yieldco while preparing to abandon the model. Each step was accompanied by public statements that deliberately obscured, rather than revealed, that continued distributions were not achievable. ¶61.

On May 8, 2023, XPLR announced it was suspending the IDR fees its subsidiary paid to NEE for all quarters through 2026, a suspension designed as a risk management tactic to avoid cutting XPLR's distributions while NEE sought financing for its own projects. ¶¶50, 171. Simultaneously, XPLR announced that it "continues to expect to grow limited partner distributions per unit by 12% to 15%

4

through at least 2026." ¶170. In mid-2023, NEE also ceased dropping down new projects to XPLR, indicating that NEE knew XPLR's model could not be sustained, a development that went unexplained to investors. ¶52. In reality, this marked the beginning of XPLR's active abandonment of its yieldco business model. ¶50.

On September 27, 2023, less than five months after reaffirming 12-15% distribution growth, XPLR revised its distribution growth guidance downward to 5-8% per year through 2026, attributing the cut to "[t]ighter monetary policy and higher interest rates." ¶¶173-74. The explanation was misleading: interest rates had already been elevated when the 12-15% guidance was issued in May 2023 and rose by only 25 basis points between that date and September 27, 2023. ¶175. Even then, Defendants disclosed no possibility of eliminating distributions entirely. ¶54. XPLR units fell approximately 20% on the announcement. ¶176.

From September 2023 through January 2025, Defendants continued to publicly reaffirm 5-8% distribution growth guidance on every quarterly earnings call, including calls on January 25, April 23, and July 24, 2024. ¶179. To sustain distributions during this period, XPLR drew on the CSCS balance—the NEE-controlled credit facility—which declined from $1.511 billion in 2023 to only $127 million in 2024. ¶¶177-78. Meanwhile, NEE raised approximately $4.4 billion through three financing transactions during 2024: $900 million in February, $2 billion in June, and $1.5 billion closing October 31, 2024. ¶¶185, 192-94. The success of these offerings depended on investor confidence in NEE's financial health, which in turn depended on XPLR's continued appearance of viability. ¶190.

### D.   The Truth Emerges and Losses Materialize

On January 28, 2025, less than three months after NEE's final financing transaction during the Class Period closed, XPLR announced that it was suspending all cash distributions to common unitholders for an indefinite period, abandoning its yieldco business model, and replacing its executive team. ¶¶59, 195-96. On this news, XPLR units fell nearly 35%, from a closing price of $15.80 per unit on January

25cv1755

27, 2025 to a closing price of $10.49 per unit on January 29, 2025. ¶60.

## LEGAL STANDARD

On a motion to dismiss, the Court must consider the complaint in its entirety, accept all well-pleaded allegations in the complaint as true, and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## ARGUMENT

### I. THE COMPLAINT PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). Further, it is misleading if it contradicts what the defendant knew at the time. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Materiality is established when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 38 (2011). "Only if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005).

Defendants' alleged misstatements about XPLR's distribution rates conveyed the same lie to investors over and over during the Class Period: that the Company's then-present financial condition supported the continued payment of ever-increasing distributions to unitholders. Defendants undertook this sustained campaign of deception because they knew that investors' appetite for XPLR units was entirely

6

25cv1755

dependent on the sustainability of its distributions to unitholders. Defendants needed to perpetuate the myth that XPLR's yieldco model was stable to ensure that the Company's controller, NEE, maintained access to the capital markets to raise $4.4 billion in financing during the Class Period.

Contrary to Defendants' arguments, Plaintiff is not required to plead that Defendants made a discrete decision that they would suspend distributions at a particular time in the future. Under Ninth Circuit law, Plaintiff need only allege that Defendants knew of material adverse facts that undermined their repeated positive statements about continued distribution growth. This Plaintiff has done so in spades. Nor can Defendants waive away their statements as mere opinions. *Omnicare* and its progeny make clear that opinion statements are actionable where: (i) they contain embedded factual statements that are false or misleading; or (ii) they omit information that makes the statements misleading to a reasonable investor. Both are true here. Finally, the PSLRA safe harbor offers Defendants no succor because: (i) their statements contained misrepresentations about present conditions and are thus outside the safe harbor; (ii) Defendants knew that their statements were false when made; and (iii) the risk disclosures accompanying those statements were not adequate.

### A. Defendants Concealed Material Adverse Facts Making Their Distribution Guidance Unreasonable When Made

Defendants' main argument is that the Complaint fails to plead any actionable misstatement because Plaintiff does not allege "that Defendants had decided to eliminate cash distributions by May 2023." ECF No. 41 ("MTD" or the "Motion") at 12-13. Not so. "Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1008 (9th Cir. 2018).

7

25cv1755

Defendants' authority confirms as much. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 317 (S.D.N.Y. 2020) (inquiry is whether statements about "distribution rates were unachievable when made").[2]

Plaintiff's allegations raise an inference that Defendants were aware of material adverse facts that undermined their statements and that the promised distribution rates were unachievable when the statements were made.

### 1. XPLR's Financial Condition Made the Represented Distribution Growth Unsustainable

During the Class Period, XPLR faced an overriding problem: it had massive financial obligations, and its operating projects were not generating enough cash to fulfill those funding needs. XPLR's financial condition undermined Defendants' repeated representations regarding long-term distribution growth. In addition to its operating expenses, which were a little over $1 billion annually, the Company faced approximately $3.4 billion in non-CEPF debt maturities through 2027, needed more than $1 billion during that period to buy out CEPFs, and an additional roughly $3.675 billion to buy out CEPFs between 2027 and 2034. ¶¶35-36. At the same time, operating and net income both deteriorated sharply by 2023.[3] In 2024, XPLR had to

---

[2]    *Dynagas* dismissed the complaint in that case not because the plaintiff failed to allege a formal decision to cut the dividend, but because the complaint offered nothing more than conclusory assertions that the speakers "must have known that their expectations were unachievable . . . without any facts to support such a statement." 504 F. Supp. 3d at 317. The operative standard was whether the dividend was achievable, not knowledge of a decision to suspend the dividend. The Complaint here provides precisely the particularized factual support *Dynagas* found lacking.

[3]    The Company had only a few hundred million dollars in cash on hand throughout the Class Period—$274 million in 2023 and $283 million in 2024. ¶37. In 2023, among other payments, XPLR paid about $1.106 billion in operating expenses and over $1.5 billion in debt payments and had only about $689 million in cash available for distribution. ¶40. In 2024, among other payments, XPLR paid about $1.702 billion in operating expenses and over $1.3 billion in debt payments, and by 2024 was using CSCS funds to sustain distributions. Meanwhile, operating income became negative in 2023 at -$28 million and -$459 million in 2024. ¶42. Similarly, net income drastically decreased from 2022 to 2024, going from $1.121

25cv1755

resort to using CSCS funds to pay its distributions. ¶41. Without additional cash or improved operating results, XPLR seemed to be teetering on the brink. Of course, XPLR could have simply told the market of its predicament and suspended distributions. But Defendants did not choose that approach. Rather, they made the decision to continually lull investors into believing that XPLR was solving its financing problems *while continuing to pay ever-increasing distributions*. Tellingly, Defendants do not explain what options XPLR was considering that would have allowed distributions to continue despite the funding pressures that XPLR faced.

### 2.      The Q1 2023 10-Q Language Change

Before April 2023, XPLR told investors that it expected to fund CEPF buyouts using its internally generated cash flow. For example, XPLR's 2022 Form 10-K, filed on February 23, 2023, stated that the Company's "ongoing operations use cash to fund . . . *the payment of any cash portion of the purchase price payable in connection with the exercise of a buyout right,*" and that it "*expects to satisfy this requirement primarily with internally generated cash flow*." ¶129.

In its Form 10-Q filed April 25, 2023, XPLR revised that disclosure and removed the reference to buyout payments from the list of its ongoing obligations funded through its own cash. ¶130. By deleting buyout payments from this disclosure, XPLR signaled that it was no longer intending to fund CEPF buyouts through its own cash—in other words, that the Company would need new, external financing if it was to buyout CEPFs.

### 3.      The September 2023 Interest Rate Explanation

In September 2023, Defendants reduced distribution growth guidance from 12-15% to 5-8% and attributed the cut to "[t]ighter monetary policy and higher interest rates." ¶202. But the interest rate environment in September 2023 was

---

billion, to $218 million, and dropping to -$411 million, respectively. ¶43. Finally, XPLR had only $375 million in cash available after distributions in 2023 and $296 million in 2024. ¶44.

9

25cv1755

materially the same as the one in which XPLR reaffirmed 12%-15% growth: the Federal Reserve raised rates from 5.00% to 5.25% on May 3, 2023, five days before the May 8 reaffirmation, and rates increased only 25 additional basis points between May and September 2023. ¶175. Thus, if rates justified the September reduction, they equally undermined the May guidance. Either the explanation was false, and Defendants were obscuring the true cause of the reduction, or interest rates were in fact the cause—meaning Defendants already knew in May, when rates stood at 5.25%, that 12-15% growth was unattainable.

### 4.   NEE Stops Dropping Down Projects to XPLR

Dropdowns were the engine of XPLR's growth model as a yieldco. Without new assets being dropped down, there is no cash flow growth and thus no basis for believing distributions can grow sustainably. From 2014 to 2023, NEER dropped down projects to OpCo every year except 2017. ¶115. The final dropdown closed in the second quarter of 2023, the same quarter as the May 8 reaffirmation. *Id*.

The cessation reflects an internal judgment that XPLR could no longer support the acquisitions that had driven its growth for nearly a decade. At minimum, it indicates that NEE had concluded XPLR was no longer a viable acquisition vehicle, and a subsidiary that cannot acquire assets cannot sustain 12%-15% distribution growth for three years.

### 5.   The CSCS Drawdown

Under the cash sweep component of the CSCS, NEER could withdraw funds from OpCo and hold them in NEER's own accounts, returning them only when needed for distributions or expenses. ¶124. At the end of 2023, the balance of swept funds held by NEER was $1.511 billion. ¶178. During 2024, NEER returned approximately $1.4 billion to XPLR, which XPLR used, in part, to sustain distributions. ¶¶177-178. By the end of 2024, the balance of swept funds had fallen to $127 million. ¶178.

With that balance nearly exhausted, XPLR had little remaining cushion from

this source. At the same time, operating income was -$459 million, leaving no clear path to fund distributions, and thus no basis to represent that they would grow. ¶145.

Despite Defendants' argument to the contrary, Defendants knew from at least May 2023 that they could not complete CEPF buyouts while continuing to pay distributions—let alone ever-increasing distributions. MTD at 12-13. Instead of informing investors of the truth, they indicated that XPLR's financial position was solid by touting not just continued distributions, but continued distribution *growth* rates until 2026 (¶¶199, 202, 204, 212, 214, 216, 218, 220, 224, 226), the lack of need for equity issuances until 2027 (¶¶202, 206, 208, 210, 222, 228), and alleged plans for dealing with the CEPF buyouts (¶¶210, 212, 222, 226, 230). *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 795 (9th Cir. 2017) (falsity alleged when defendant's statements directly contradict what defendant knew at that time); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "anticipates a continuation of its accelerated expansion schedule" when the expansion had already failed was materially misleading).

**B.    Defendants Misled Investors by Touting Falsely Positive Statements Regarding XPLR's Financial Condition**

Defendants argue that the alleged misstatements did not convey that distribution growth or the yieldco model were secure through 2026. MTD at 13-14. However, reasonable investors were misled into believing that XPLR's financial condition continued to be positive, and that distributions would not only continue, but would grow, as Defendants kept stating over and over again. *See Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists"); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (where defendants' statement could have had multiple interpretations by reasonable investors, defendants did not adequately disclose). Defendants gave investors the false

11

25cv1755

impression that XPLR's financial condition was stable, distribution growth would continue until 2026, and that they were addressing the CEPF buyouts.

Defendants argue that their statements were merely "targets" and "expectations." MTD at 13. This is incorrect as the statements created a false impression of the then-current condition of XPLR. *See Brody*, 280 F.3d at 1006. Further, Defendants' statements were misleading because they "concealed or downplayed known present risks" and failed to disclose known concerns about whether the distribution guidance could be achieved. *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009). Not once did Defendants state that the distribution growth rates being touted could not be achieved based on XPLR's then-current financial condition. Instead, Defendants undertook a series of one-off fixes and positive spins to maintain the then-current appearance of XPLR's stability, while preparing NEE for the termination of distributions and the elimination of XPLR's yieldco model. *See Warshaw v. Xoma Corp.,* 74 F.3d 955, 959-60 (9th Cir. 1996) (company's optimistic statements, which failed to disclose concerns, were basis for claim); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("Once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."). The challenged statements implied falsely positive present representations. For example:

*May 8, 2023*. Ketchum misled investors on May 8, 2023 by claiming that XPLR "continues to see 12% to 15% growth per year in limited partner distributions per unit as being a reasonable range of expectations through at least 2026," ¶199, while knowing that XPLR owed $5 billion, and that they were resorting to suspending IDR fees to keep distributions going short-term. The continuation of the growth rate falsely implied that XPLR was presently in a stable financial condition.

*September 27, 2023*. Ketchum claimed on September 27, 2023 that XPLR "is

12

25cv1755

revising its long-term growth rate expectations . . . to increase its flexibility as it continues to execute on its growth opportunities," ¶201, blaming "[t]ighter monetary policy and higher interest rates." ¶202. XPLR then announced the new growth rate to be "5% to 8%" per year through at least 2026, with a target growth rate of 6%—still an admirable rate. ¶204. The press release further favorably stated that XPLR "d[id] not expect to require growth equity to meet its revised growth expectations until 2027"—indicating XPLR's present position. ¶206. Ketchum reassured that "[t]hrough continued execution of its plans, [XPLR] is charting a course to a sustainable future with significant growth visibility." ¶210, *see also* ¶208. These statements provided no indication to a reasonable investor that distributions were no longer viable given XPLR's then-current financial condition, and instead implied that there were plans currently being "execut[ed]" to provide for growth.

*October 24, 2023*. Defendants argue that on October 24, 2023, XPLR stated that CEPFs were coming due while rates were rising, making it harder to support distributions. MTD at 16. Yet, they still touted a 6% distribution growth rate, despite these conditions. *Id.*, Ex. U at 6.

*January 25, 2024*. Ketchum stated on January 25, 2024 that XPLR was focused on "executing against the partnership's transition plans" and delivering a distribution "growth target of 6% through at least 2026," and Crews echoed this statement, adding that XPLR "continue[s] to see 5% to 8% growth per year." ¶¶212, 214. Ketchum further assured investors that they "do[] not expect to require growth equity until 2027," nor "acquisition in 2024"—indicating XPLR's present condition. ¶216. These statements provide no indication to a reasonable investor that the distributions or yieldco model would cease to exist. In fact, everything appeared completely fine and was being presently "execut[ed]" according to plan.

*January 25, 2024*. Defendants argue that on January 25, 2024, XPLR announced that it was "evaluating alternatives to address the remaining [CEPFs]" and that "all options" were on the table. MTD at 16. Defendants' statement that same

13

25cv1755

day of a 6% target distribution growth rate for years to come was incongruent with the complete elimination of distributions. Similarly, Defendants argue that in February 2024, XPLR warned in its Form 10-K that CEPFs could mean XPLR "may not be able to pay distributions to its unitholders" and "may reserve cash that otherwise would be available for distribution to unitholders for any such [CEPF] buyout or other business purposes in its discretion." *Id.* This in itself is misleading, as Defendants already *knew* at that point that they would be terminating distributions, not that they "may" terminate distributions. By this time, IDR fees were eliminated and dropdowns had stopped. And still, XPLR owed $5 billion with no apparent plan. Two months later, Defendants continued to paint a rosy picture of distribution expectations, stating over and over again that distribution growth will continue.

*April 23, 2024*. On April 23, 2024—*even after the alleged 10-K warning*—Crews once again stated that they "continue[] to focus on executing against the partnership's transition plan," that the target is "6% through at least 2026," and XPLR would not need an acquisition to achieve that target. ¶¶218, 220. When asked about the CEPF buyouts, Ketchum minimized the issue, stating that "discussions continue to move forward" and there was "a lot of interest in" a "private capital raise." ¶222. The statements implied that plans were being presently "execut[ed]," acquisition was not presently needed, and XPLR was presently on track to meet its distribution target. There was no mention of eliminating distributions or the yieldco model.

*July 24, 2024*. On July 24, 2024, Bolster reiterated the target 6% growth expectation through "at least 2026." ¶224. Bolster further stated that XPLR "does not need acquisition-related financing in 2024 to meet its 6% target and does not need [growth] equity until 2027"—indicating XPLR's present financial condition. ¶226. When asked what Bolster meant by the target distribution growth remaining "for now," Ketchum minimized the issue, stating that they "have time," "don't have

14

25cv1755

to do anything," "don't have any drops planned for '24," and "don't have growth equity needs until '27," again indicating the present condition of XPLR. ¶¶226, 228. Bolster and Ketchum implied that XPLR was presently on track to meet distribution growth expectations and did not indicate that distributions could be eliminated.

*October 23, 2024*. When Bolster omitted the distribution growth targets on October 23, 2024, he stated that XPLR was "continu[ing] to evaluate" how to address the CEPF obligations and its cost of capital, and that the Company would provide a distribution update. ¶230. He did not state that eliminating distributions was one of the possibilities of this evaluation. In fact, as cited by Defendants, Ketchum stated on that date that: "One of the things we are evaluating is should we deploy more of our capital towards really growing the underlying cash flow of the business and _maybe less_ towards distributions." MTD at 10 (emphasis added). "Maybe less" does not imply complete elimination of distributions.

Defendants argue that the distribution statements were a "target" within a "reasonable range of expectation." *Id.* at 13-14. But Defendants knew that this "target" was unreachable given XPLR's financial condition when they made those statements and was not within any "reasonable range." They misled investors by framing the then-present financial condition of XPLR in a positive light, while promising distribution growth that they knew would never come.[4]

---

[4]     Defendants' authorities (MTD at 14) merely observe that statements about anticipated future dividends are not promises or guarantees.  But the Ninth Circuit has long recognized that "projections and general expressions of optimism may be actionable." *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989). In *In re Int'l Bus. Machs. Corp. Sec. Litig.*, the dividend statements were made by management, who had no power to declare dividends and thus could not have guaranteed anything. 163 F.3d 102, 107 (2d Cir. 1998). Here, the Individual Defendants were directors of XPLR and thus had the authority to adjust distributions. Meanwhile, in *Maeve Inv. Co. v. Teekay Corp.*, plaintiff appears not to have pled specific facts about *why* the company's financial condition at the time of the statements imperiled future dividends.  2017 WL 5158059, at *3 (W.D. Wash. Nov. 7, 2017). Not so here, where Plaintiff has pled numerous facts supporting the

15

### C.    XPLR's Risk Disclosures Were Not Adequate

Against the backdrop of reassuring statements that distribution growth would continue until 2026 and XPLR was making plans for the buyouts, Defendants argue that they provided disclosure language that made clear that distributions were not indeed secure through 2026. MTD at 13-16. They are wrong. "Only if a disclosure was so obvious that reasonable minds could not differ can the issue of whether shareholders have been adequately cautioned about the risks be settled as a matter of law." *Warshaw*, 74 F.3d at 959. "[I]nclusion of some cautionary language in a company's disclosures is not enough to support a determination as a matter of law that defendant's statements were not misleading." *Id.* Here, the disclosures did not inform the market that the risks had already materialized, and thus unitholders were not adequately cautioned.

Importantly, none of Defendants' cited disclosures state that XPLR's then-current financial condition made continued increasing distributions untenable or that distributions or the yieldco model would be eliminated. MTD at 14-15. Defendants cite to numerous disclosures before the Class Period (filled with "may" and "could" language), which are irrelevant as Plaintiff does not argue that the risks had materialized before the Class Period. *Id*. Defendants then cite to the 2023 Form 10-K (*id*. at 15), when the risks had already materialized, which warned of things that "could" occur. *Id*., Ex. B. The Class Period disclosures "speak[] entirely of as-yet-unrealized risks and contingencies" and do not "alert[] the reader that some of these risks may already have come to fruition." *Berson*, 527 F.3d at 986. This is misleading as Defendants knew that those "risks had materialized." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021).

Defendants further point to alleged disclosure statements made in October 2023, February 2024, and January 2024. MTD at 16. As described above, none of

---

inference that continued distributions were unachievable given XPLR's financial condition when the statements were made.

16

25cv1755

those statements implied or stated that distributions were not achievable given XPLR's financial condition or that distribution elimination was on the table.

### D.    Even if Opinions, Defendants' Statements Are Actionable Under *Omnicare*

Defendants argue that all their statements were opinions. MTD at 16. But as Defendants concede (*id.*), opinions are not *per se* inactionable. *First*, an opinion is misleading by omission where the statement "omits material facts about the [defendants'] inquiry into or knowledge concerning a statement of opinion" and if those "facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

Defendants' statements did not disclose the adverse material facts that they knew, i.e., that XPLR's financial condition at the time of the statements made the continued payment of ever-increasing dividends unachievable, including because XPLR did not have enough money to both continue paying distributions and address its CEPF buyout obligations. Further, given that Defendants were also executives of NEE, they knew, but did not tell investors, that NEE needed to maintain the façade that XPLR's yieldco model was sustainable, to allow NEE to raise needed financing.

*Second*, opinions are actionable if the speaker did not hold the stated belief. *See Omnicare*, 575 U.S. at 184-85. Given Defendants' knowledge, as discussed immediately above, they could not have reasonably held the belief that distributions would keep growing. The particularized facts pled in the Complaint about why continued increasing distributions were unsustainable given XPLR's financial condition at the time the statements were made distinguishes this case from *Dynagas*, 504 F. Supp. 3d at 317, on which Defendants rely. MTD at 17.

*Third*, opinion-based statements are actionable if they are anchored in "misrepresentations of existing facts." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). As shown above, Defendants embedded false

17

25cv1755

assertions concerning XPLR's then-current financial position and financing plans. *See Omnicare*, 575 U.S. at 185 ("embedded statements of fact" are actionable if untrue). A reasonable investor hearing statements about not just continued, but growing, distributions and alleged plans would have (wrongly) believed that distributions would continue.

### E.    PSLRA Safe Harbor Does Not Immunize Defendants' Statements

The Ninth Circuit has held that the present-sense component of mixed statements that also contain forward-looking content are not protected by the PSLRA safe harbor to the extent they misstate or omit current facts. *Quality Sys.*, 865 F.3d at 1142. As described above, Defendants' statements (¶¶199-231) contained a present-tense component: that when the statements were made, XPLR's then-present financial condition made the promised dividend growth achievable. *See Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 879-80 (N.D. Ill. 2023) (statement that included "continues" verbiage "expressed in the present-indefinite tense to report that an action that is presently and regularly occurring will continue onward," and was thus not protected by safe harbor). Those present-tense representations were false when made.

Similarly, even if any part of the challenged statements is forward-looking, Defendants may be held liable if a "forward-looking statement" is made with "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5. As described above, that is precisely what Plaintiff has shown.

Moreover, even if "forward-looking," the statements were not accompanied by the requisite "meaningful cautionary statement," as they "failed to alert the investors that some of these risks may have already come to fruition." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 937 (9th Cir. 2003); *Khoja*, 899 F.3d at 1010; *Quality Sys.*, 865 F.3d at 1149 (statements that company anticipates positive outcome were actionable as defendants had actual knowledge as to their falsity). The risk disclosures spoke of

18

risks that "could" occur even though facts had already occurred. *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949-50 (9th Cir. 2023) (statements that risks "could" occur when, in fact, those risks had already occurred are inadequate). Further, stating that "reducing" "cash available for distribution" was a possibility and that the business "relies heavily on the availability of debt and equity financial sources" did not warn that distributions were not achievable or would be eliminated. MTD at 19. Nor did the "risk warnings" address the very specific issue of the *elimination* of the yieldco model. *See, e.g.*, *In re Biomarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *7 (N.D. Cal. Jan. 6, 2022) (warnings must "precise[ly] and directly address the alleged misrepresentations").[5]

## II.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, . . . but also 'deliberate recklessness.'" *Schueneman*, 840 F.3d at 705. Plaintiff must plead facts giving rise to a "strong inference" of scienter, one that "need not be irrefutable . . . or even the most plausible"—only "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 322-24. No "smoking-gun" is required. *Id*. Critically, the court "must consider the complaint in its entirety." *Id*. at 323. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 310. Considered holistically, the Complaint's allegations give rise to a strong inference of scienter and satisfy both the deliberate-recklessness and actual

---

[5]    Defendants' reliance on *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 257-58 (3d Cir. 2009) is inapposite as it involves risk disclosures of risks that have not yet occurred. MTD at 19. Their reliance on *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) and *Dynagas*, 504 F. Supp. 3d at 319 ignores that defendants in those cases actually warned investors of the risks, unlike here where Defendants did not warn investors about the potential termination of the yieldco model.

19

25cv1755

knowledge standards.

### A.   Defendants' Actual Knowledge Establishes Scienter

As described above, the Complaint pleads numerous particularized facts establishing that Defendants knew that: (i) XPLR's then-present financial condition meant that the continued payment of ever increasing distributions was unsustainable; and (ii) their positive statements to the market conflicted with the true undisclosed facts. *See Schueneman*, 840 F.3d at 705-08 (holding that once defendants chose to tout positive information to the market, they were required to do so in a manner that would not mislead investors, including by disclosing adverse information that cut against those representations; scienter was adequately pleaded where defendants made affirmative public statements while aware of undisclosed adverse facts that rendered those representations misleading). Defendants:

- Concluded that CEPF buyouts could no longer be funded from internally generated cash flow and changed the language in their filings, yet, 13 days later, publicly reaffirmed 12-15% distribution growth through at least 2026 even though distributions and buyouts competed for the same cash. ¶129-30.

- Attributed a 50% reduction in distribution growth targets to a 25 bp increase in interest rates, even though rates were already at approximately 5% at the time Defendants issued the guidance being cut, such that either the explanation was false or Defendants already knew the original guidance was unattainable. ¶175, 202.

- Relied on $1.4 billion being returned under the CSCS to sustain distribution growth, while operating income stood at negative $459 million and the CSCS balance was rapidly depleting. ¶¶124, 177-78.

- Stopped all project dropdowns in the same quarter as the May 8, 2023 reaffirmation, conceding that XPLR could no longer support the acquisitions that had driven its growth for nearly a decade, while

reaffirming 12-15% distribution growth through at least 2026. ¶115.

- Completed $4.4 billion of NEE financing transactions while reaffirming distribution guidance, with about $20 billion of NEER's cash flow dependent on continued investor confidence in XPLR. ¶¶185, 192-94.

- Faced a straightforward liquidity problem: XPLR had approximately $3.4 billion in debt outside of CEPF buyouts maturing through 2027 (¶35), only a few hundred million dollars remaining after distributions in 2023 and 2024 (¶44), declining operating and net income that turned sharply negative (¶¶42-43), and a few hundred million dollars of cash on hand in 2023 and 2024 (¶37), leaving no realistic path to fund CEPF buyouts while also maintaining and growing distributions at the represented levels.

These facts are particularly compelling because the relevant guidance was reaffirmed by officers simultaneously serving in leadership roles at both XPLR and NEE, including Individual Defendants, each of whom had direct knowledge of conditions undermining XPLR's ability to sustain the projected distribution growth.[6] Taken together, these facts make the inference of fraud substantially more compelling than any innocent alternative. That inference flows directly from Defendants' own disclosed decisions and actions. This is the kind of cumulative circumstantial case of actual knowledge of truth that *Tellabs* contemplates.

**B.     The Core Operations Doctrine Supports Scienter**

The Ninth Circuit's "core operations" doctrine permits an inference of scienter from facts critical to a company's core operations, on the theory that such facts are generally known to key officers. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008). Where relevant facts are of such prominence that it would

---

[6]  Defendants cite *In re Dot Hill Sys. Corp. Sec. Litig.* (MTD at 22), for the premise that scienter was not pled where defendants were aware of factors underlying inaccuracies in financial statements *but did not know the statements to be false*. 2009 WL 734296 (S.D. Cal. Sept. 2, 2008). Here, however, Defendants knew that the statements were false, not just that factors underlying inaccuracies were false.

21

be "absurd to suggest" that top management was unaware of them, knowledge may be inferred even where plaintiffs "allege no particular facts indicating that [defendants] actually knew" about the adverse conditions at issue. *Berson*, 527 F.3d at 987-89.

The CEPF obligations, distribution obligations, lack of cash, declining CSCS balance, cessation of dropdowns, and removal of buyout obligations from cash flow guidance are not peripheral operational facts. They define the financing structure of XPLR's yieldco business model. Their prominence supports a strong inference that Ketchum, Crews, and Bolster knew their statements reaffirming distribution growth were false or misleading when made.

The CEPF structure was the financing mechanism on which the yieldco business model depended. Defendants themselves removed CEPF buyout obligations from cash flow guidance, ceased dropdowns, and disclosed the declining CSCS balance. No reasonable factfinder could conclude that the CEO and CFOs of a yieldco were unaware of the solvency of the vehicle supporting their publicly reaffirmed distribution growth, or that those responsible for these disclosure changes were unaware of the conditions that necessitated them. *See id.* at 988-89 (stop-work orders halting "tens of millions of dollars of the company's work" were "prominent enough that it would be absurd to suggest that top management was unaware of them"); *Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.,* 166 F.4th 805, 833-34 (9th Cir. 2026) (extends the doctrine to operational facts central to company's business model).

**C.    Defendant-Specific Attribution Defeats Group Pleading Problem**

Each Individual Defendant's dual role as an executive and officer of XPLR and NEE gave them direct knowledge of the facts established above. Ketchum, as CEO of both entities throughout the entire Class Period, made false and misleading distribution growth statements on May 8, 2023, September 27, 2023, January 25, 2024, and July 24, 2024. ¶¶199, 202, 212, 228. He served in that role across the

22

dropdown cessation and May 8 reaffirmation, which occurred in the same quarter.

*United States v. Bestfoods* does not help Defendants. 524 U.S. 51, 69 (1998). That case addressed attribution of conduct: whether a dual officer's acts are chargeable to the parent or the subsidiary. *Id.* It did not hold that an officer's knowledge may be bifurcated based on the title he was holding at a given moment. Whatever hat Ketchum was wearing on May 8, 2023, he knew what NEE had decided about dropdowns the same quarter because he led NEE.

Crews, as CFO of both entities from March 2022 to May 2024, approved the 1Q 2023 10-Q that removed CEPF buyouts from internally generated cash flow coverage, and then reaffirmed 6% distribution growth guidance on the January 25, 2024 and April 23, 2024 earnings calls with full knowledge of what that language change signaled about XPLR's cash capacity. ¶¶72, 130, 214, 218, 220. Bolster, as CFO of both entities from May 2024 onward, knew that XPLR was funding distributions with cash returned under the CSCS rather than its own operations, yet reaffirmed 6% distribution growth guidance as sustainable on the July 24, 2024 earnings call. ¶¶224, 226. He then withdrew the distribution growth target on the October 23, 2024 call without disclosing the impending suspension, eight days before the final NEE financing transaction closed. ¶¶194, 230. Scienter is therefore attributable to NEE and XPLR through these same officers. ¶¶99-102.

### D.    Defendants' Miscellaneous Counterarguments Fail

Defendants' argument that the Complaint is devoid of "any document, email, statement, or witness account pointing to any Defendant's state of mind" is unavailing. MTD at 20. The Ninth Circuit has repeatedly sustained scienter in the absence of precisely those elements. *See Berson*, 527 F.3d at 987-89 (sustaining scienter despite "no particular facts indicating that [defendants] actually knew" of the concealed facts); *Funko*, 166 F.4th at 831-34 (sustaining scienter on the operational prominence of the concealed facts; "Plaintiffs do not need to establish affirmative knowledge so long as they raise a strong inference that Defendants would

23

have known of the issues given their importance to [the company's] business"); *Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2025 WL 2426714, at *6 (C.D. Cal. Aug. 20, 2025) (confidential witness not required in complaint).

Defendants also argue that the absence of insider stock sales undermines scienter, and separately that their acquisition of XPLR units during the Class Period demonstrates good faith. MTD at 22-23. Neither *Webb* nor *Rigel*, cited by Defendants, holds that lack of stock sales is dispositive. MTD at 23; *Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012). Defendants were compensated entirely by NEE, not XPLR. ¶101. Where Defendants' primary economic interest ran to NEE rather than XPLR, the absence of XPLR stock sales proves little about the alignment of their incentives with XPLR unitholders, and acquiring nominal XPLR units while being paid entirely by NEE does not change that alignment. *See Alphabet*, 1 F.4th at 707 ("Allegations of suspicious stock sales … are not needed where, as here, other allegations in the complaint raise a strong inference of scienter.").

Defendants' reliance on NEE's suspension of IDR fees fares no better. MTD at 23-24. The suspension is not evidence against fraud; it is an admission of the deteriorating condition Defendants were concealing. NEE suspended the IDR fee precisely because XPLR could no longer sustain distributions without that relief, a fact the market would not have understood from the face of the disclosure. And because IDR fees were tied to distribution levels, ¶¶21, 79, NEE's economic interest was in keeping distributions flowing at some level long enough to close their financings. Suspending the fee was the cost of preserving that appearance.[7] They cannot claim credit for transparency about a step they were required to disclose. Defendants' executive compensation argument likewise misframes the FAC's theory. MTD at 24. The Complaint does not allege that the Individual Defendants

---

[7]   Unlike in *Dot Hill* that Defendants cite to, the intent was not to alleviate XPLR's challenges but to hide them. 594 F. Supp. 2d at 1160; MTD at 24.

24

25cv1755

raised the EBITDA vesting target to harm themselves. It alleges that Ketchum and Crews, as part of the board, raised the target to preserve cash for NEE if XPLR's trajectory continued to deteriorate—an increase that would protect NEE and would not affect Ketchum or Crews as a new XPLR CEO and CFO were appointed when XPLR's true financial condition was announced. ¶¶181-84, 238.

## III.   THE COMPLAINT PLEADS LOSS CAUSATION

Defendants argue that Plaintiff cannot recover for the price decline that followed the September 27, 2023 partial disclosure because he first purchased XPLR units on October 9, 2024. MTD at 26. Plaintiff does not contend otherwise as to his own recovery. The putative class, however, is defined to include investors who purchased during the period beginning May 8, 2023 (¶1), and they may recover for losses attributable to the September 2023 partial disclosure. *See York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1197-98 (N.D. Cal. 2024) (rejecting argument that named plaintiff lacked standing to pursue class claims for portion of class period during which she did not hold shares; was "question of adequacy, not standing" to be tested at the class certification stage); *Melendres v. Arpaio*, 784 F.3d 1254, 1261-63 (9th Cir. 2015).

## IV.   DEFENDANTS' TRUTH-ON-THE-MARKET DEFENSE IS PREMATURE AND FLAWED

Defendants argue that investors drew the conclusion that XPLR was going to completely eliminate distributions due to Defendants' alleged "open dialogue" with investors and "real-time market updates." MTD at 15-16. The Court should reject this thinly veiled truth-on-the-market-defense.

"As a general rule, the truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). "[T]he issue is more appropriately resolved by trial than by a motion to dismiss." *In re Immune Response*, 375 F. Supp. 2d at 1036. To carry their "heavy burden," Defendants must show that the allegedly

25

curative information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance Defendants' misleading impressions." *Id*. "Dismissal is proper only if [Defendants] show that no rational jury could find that the market was misled. If the evidence presents a sufficient disagreement to require submission to the jury, a motion to dismiss should be denied." *Id*.

Defendants do not come close to meeting this exacting standard. Disclosures of generic risks regarding market conditions (such as rising interest rates and borrowing costs), warnings couched in the hypothetical (when the risks had already begun to manifest), and scattered market speculation[8] cannot counteract as a matter of law the steady drumbeat of Defendants' statements to investors during the Class Period that distributions would not only continue through 2026, but would increase. *See, e.g.*, *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *10-11 (S.D. Cal. Sept. 27, 2022) (rejecting truth-on-the-market defense at motion-to-dismiss stage where defendants made repeated reassuring statements throughout the class period and an earlier disclosure of the underlying study data was not "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression" created by defendants' one-sided representations); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011) ("Any conflicting interpretation of the false or misleading statements, therefore, will likely lead to considerations of fact that are inappropriate at the 12(b)(6) stage of litigation.").

More fundamentally, if the market was aware that XPLR's distributions were not sustainable that "would already be reflected in the stock's price." *Facebook*, 87

---

[8] That a single analyst speculated that XPLR would eliminate distributions does not suffice to establish market knowledge. *See In re Newbridge Networks Sec. Litig.*, 962 F. Supp. 166, 178-79 (D.D.C. 1997) ("[A] change in one analyst's growth estimates does not mean that the market knew all of the material undisclosed facts concerning the problems the Company was having.").

25cv1755

F.4th at 948. Yet XPLR shares plummeted nearly 35% on the news that distributions were being suspended and analysts voiced their surprise. ¶¶240-41. This gives the lie to Defendants' truth-on-the-market theory. *See, e.g.*, *Scott v. ZST Digital Networks, Inc.*, 2012 WL 538279, at *12 (C.D. Cal. Feb. 14, 2012).

## V.    NEE CONTROLLED XPLR FOR PURPOSES OF THE §§10(B) AND 20(A) CLAIMS

### A.    NEE Controlled XPLR for Purposes of the §§10(b) and 20(a) Claims

Defendants argue that the Section 20(a) claim against NEE must be dismissed because Plaintiff failed to allege a primary violation against NEE and allege that NEE is a control person. MTD at 28. This is incorrect. A plaintiff must show: (1) "a primary violation of federal securities law" by the controlled person; and (2) "that the defendant exercised actual power *or* control over the primary violator." *No. 84 Emp'r-Teamster*, 320 F.3d at 945. "[I]t is not necessary to show actual participation or the exercise of power." *Id*. Plaintiff "does not have the burden of establishing [the controlling] person's scienter distinct from the controlled corporation's scienter." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Plaintiff has shown a violation of federal securities law in spades, as discussed above. Whether NEE is a control person "involv[es] scrutiny" of NEE's "participation in the day-to-day affairs" of XPLR, and NEE's "power to control corporate actions." *No. 84 Emp'r-Teamster*, 320 F.3d at 945.[9]

NEE was affiliated with and controlled XPLR. ¶6. NEE formed XPLR for its own benefit. ¶¶11-14, 17-23, 48, 75-83, 105, 119-20, 122-26, 154. NEE maintained a majority ownership stake in XPLR. ¶118. The Individual Defendants were simultaneously executives and directors of XPLR as well as executives, officers, and/or directors of NEE and/or its affiliates. ¶¶70-72, 99. *See No. 84 Emp'r-*

---

[9]    "Control" is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405.

27

*Teamster*, 320 F.3d at 946 (officers seated on board is, among other factors, indication of control). They could put NEE's interests above those of XPLR, ¶¶9, 103, and were compensated by NEE or its affiliates, not by XPLR. ¶101. They had control over XPLR's financial filings and statements at issue. ¶70. Their dual roles and disclosed loyalty to NEE indicate that NEE controlled XPLR. *See Howard*, 228 F.3d at 1065–66 (for control person liability, "actual authority over preparation and presentation to public of the financial statements at issue is sufficient").

Further, XPLR and NextEra Energy Management Partners, LP were parties to the MSA, "under which operational, management and administrative services are provided to XPLR under the direction of the board, including managing XPLR's day-to-day affairs and providing individuals to act as XPLR's executive officers." ¶69. XPLR relied solely on employees provided under the MSA to serve as officers. ¶100. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1200 (D. Or. 2015) (day-to-day oversight of operations are factor in presuming control).

## B.    Plaintiff Alleges that NEE Violated §10(b)

As described above, NEE controls XPLR. The Individual Defendants, the statement makers, are executives of NEE and can make decisions that benefit NEE over XPLR. Unlike in *Janus Cap. Grp., Inc. v. First Derivative Traders*, NEE does not just "exercise significant influence" over XPLR. 564 U.S. 135, 145-46 (2011). Rather, NEE has full control over XPLR and its board. XPLR was created to benefit NEE, and NEE had the power to do with XPLR what it wanted. NEE held the "ultimate authority" over statements made by XPLR's executives. *Id*. at 142-44.[10]

## CONCLUSION

The Court should deny Defendants' motion. If the Court grants the motion, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15; *Ferry v. DF Growth REIT*, 2024 WL 5011949, at \*14 (S.D. Cal. Dec. 6, 2024).

---

[10]    Unlike in *Bestfoods*, here the control does not merely come from NEE's ownership of XPLR's units. 524 U.S. at 61.

28

25cv1755

DATED: May 1, 2026

Respectfully Submitted,
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Karolina Klyuchnikova*
Karolina Klyuchnikova (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Logan Rudman (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: 212-223-6444
Fax: 212-223-6334
kklyuchnikova@scott-scott.com
tlaughlin@scott-scott.com
lrudman@scott-scott.com

John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: 619-233-4565
Fax: 619-233-0508
jjasnoch@scott-scott.com

*Counsel for Plaintiff*
*James Alvrus and the Proposed Class*

Brian J. Schall (CA 290685)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: 310-301-3335
Fax: 310-388-0192
brian@schallfirm.com

*Additional Counsel for Plaintiff James Alvrus*

29

25cv1755